Richard HOFFMAN, Plaintiff,

v.

EAST TROY COMMUNITY SCHOOL DISTRICT, and Walworth County Handicapped Children's Education Board, Defendants.

No. 97–C–944.

United States District Court, E.D. Wisconsin.

March 4, 1999.

Ronald S. Stadler, Brookfield, WI, for plaintiff.

Peter A. Martin, John J. Prentice, Milwaukee, WI, for defendants.

## DECISION AND ORDER

ADELMAN, District Judge

Plaintiff Richard Hoffman filed this action under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* (1998) [1] ("IDEA" or "Act"). Hoffman, exercising his right under § 1415(i)(2) to appeal an adverse decision by a state administrative reviewing officer, claims that defendants East Troy Community School District ("District") and Walworth County Handicapped Children's Education Board ("Board") violated the Act by failing to identify his son Joseph as having a serious emotional disturbance that required special education and related services. Plaintiff argues that defendants' failure to provide Joseph with a free appropriate public education necessitated placing him in a private residential facility. Hoffman seeks reimbursement for the expenses associated with this placement.

## I. OVERVIEW OF PLAINTIFF'S CLAIMS UNDER THE IDEA

The IDEA provides federal funding to help state and local agencies educate disabled children, but conditions this funding on state compliance with numerous goals and procedures set forth in the Act. To qualify for federal assistance, a state must develop policies that assure all disabled children the right to a "free appropriate public education." *See* 20 U.S.C. §§ 1400(d)(1)(A), 1401(8). Appropriate special education and related services, provided at public cost, are tailored to the unique needs of the disabled child by means of an "individualized education program" ("IEP"). *See* 20 U.S.C. §§ 1401(11), 1414(d). The IEP is prepared by a team consisting of the child's parents, regular and special education teachers, a representative of the local educational agency and, where appropriate, the child herself. 20 U.S.C. § 1414(d)(1)(B). The proposed IEP should assess the child's present performance levels; set out goals and short-term objectives; describe in detail the special education and related services to be provided, setting a projected starting date; and, if necessary, explain and justify a child's proposed non-participation in regular classes. See 20 U.S.C. § 1414(d)(1)(A).

In addition to guidelines for formulating an IEP, the IDEA imposes extensive procedural requirements on states receiving federal money under the Act. *See generally* 20 U.S.C. § 1415. Most relevant for our purposes is the IDEA's "child find" obligation. The Act requires states to ensure that

> [a]ll children with disabilities residing in the State, including children with disabilities attending private schools, regardless of the severity of their disabilities, and who are in need of special

---

1. The IDEA was extensively amended in 1997. This action is governed by the pre–1997 statute. However, the relevant statutory language and key concepts have for the most part remained unchanged, although many provisions are now renumbered. For ease of reference, I cite to the current statute throughout this opinion.

education or related services, are identified, located, and evaluated . . .

20 U.S.C. § 1412(a)(3)(A).

In compliance with this and other IDEA obligations, Wisconsin enacted Chapter 115, Subchapter V of the Wisconsin Statutes ("Children With Disabilities"); and Chapter Pl 11 of the Wisconsin Administrative Code ("Children With Exceptional Educational Needs"). Plaintiff's claim for reimbursement in the present action hinges on alleged violations of several procedural requirements imposed by these state statutes and regulations. Specifically, plaintiff alleges that the District and/or the Board: (1) failed to refer Joseph for an exceptional educational needs ("EEN") evaluation; (2) failed to properly screen transfer students for EEN or to train teachers to spot EEN students; (3) failed to adequately inform plaintiff of his right to submit an EEN referral; and (4) failed to complete a multidisciplinary team ("M-team") evaluation of Joseph once the referral was in fact submitted. *See* Wis.Admin.Code § PI 11.03 (1990); Wis.Stat. § 115.80 (1993).

Before me are motions for summary judgment filed by all parties, asking me to decide this case on the basis of the administrative record. *See* 20 U.S.C. § 1415(i)(2)(B).

## II.  FACTUAL BACKGROUND

The following facts are generally undisputed. Where facts *are* disputed, or where my findings differ from or expand on those of the administrative reviewing officer, I cite to the record to indicate the basis for my factual determinations.

### A.  Facts Relevant to Lack of EEN Referral

Joseph Hoffman was born on October 31, 1976. From kindergarten to ninth grade, Joseph's education was uneventful;

his scholastic achievement was commensurate with high intelligence and abilities, as indicated by IQ and standardized tests. Throughout this time he attended private/parochial schools in Milwaukee, although he and his parents resided within the boundaries of the East Troy Community School District.

Joseph began having behavioral problems during tenth grade at Marquette University High School ("Marquette"), a Jesuit preparatory school. Those problems included shoplifting, using his parents' car without permission, temper outbursts at home, difficulty communicating with parents, one occasion of masturbating in public (although the nature and egregiousness of this incident are unclear from the record), and running up his parents' credit card bills by calling phone sex lines. At the time, Joseph's father attributed some of these problems to certain classmates his son was associating with at school. Academically, Joseph's grades declined during the second semester of tenth grade, causing his cumulative GPA to drop from 3.4 to 3.229. (Vol.2, Ex. 13o[14].[2] )

In March 1993 of Joseph's sophomore year, plaintiff arranged for his son to receive private psychological counseling with Dr. Robert M. Dries. Therapy was to address issues of emotional withdrawal, oppositional behaviors, and declining school performance. The initial diagnostic impression was dysthymia, a mood disorder manifested as a mild form of depression. Dr. Dries continued to treat Joseph until his father switched therapists in November 1993.

At the start of his junior year, Joseph transferred to East Troy High School ("East Troy"). Joseph and plaintiff met with Rick Penniston, the East Troy school counselor, to discuss Joseph's class schedule and other school-related issues. As

---

**2.** In an attempt to make the record a little more accessible to readers of this opinion, I have also included in square brackets the exhibit number used in the administrative proceedings and which actually appears *on* the exhibits. Thus, the cite to the record before this court is "Vol. 2, Ex. 13o"; but the document is actually labeled "Exhibit 14."

part of this intake session, Joseph filled out a new transfer student screening form. Penniston testified that he went through this form orally with parent and student. In addition to general information (family members, favorite classes, hobbies, etc.), the form inquired about possible physical problems or disabilities and specifically asked whether Joseph had "ever been in any special classes such as learning disabilities, behavioral disabilities, excellerated [sic] programs, remedial instruction, etc.?" (Vol.2, Ex. 13aa[26].) Joseph circled "No." Nothing else on the completed form suggests that Joseph had been having behavioral or academic problems at his previous school. Hoffman says he did not tell Penniston about any problems at Marquette or other concerns about Joseph because he wanted his son to have a fresh start in his new school

The first sign that Joseph was having problems at East Troy was a call to plaintiff from Joseph's English teacher, William Sternberg, on September 29, 1993. Sternberg told Hoffman that Joseph had been falling asleep in his Novels class. The call coincided with his giving Joseph a four and a half week status grade of "F" in Novels. Joseph had told Sternberg that his napping was "job-related," or due to working a lot of hours outside school. Sternberg also testified that Joseph stopped sleeping when he was told not to, on pain of removal from the class, and that Joseph improved his performance enough to ultimately pass Novels with a grade of "C−". (Tr. 3/6/96 at 110–12.)

Joseph's four and a half week status report also included a "B−" in Computers and a "C−" in Advanced Algebra and Trigonometry. The same teacher, Mary Schultz, taught both courses. Schultz testified that in the computers class, which met first period, Joseph had a tendency to fall asleep. She described his demeanor when asked about the problem as responsive and polite, but apathetic. (Tr. 3/6/96 at 129, 143.) Joseph told her that he was tired at school because he worked late at night. Schultz contacted Joseph's parents about his performance and spoke with them on the phone and in person several times throughout the semester. (Id. at 136–37.) Hoffman never offered another explanation for his son's sleeping in class, although Schultz told him that Joseph said he was working late. Schultz said she had no reason to think this was not the cause or that Joseph had a disabling condition. (Id. at 132, 144.) "[W]hen Joe would decide to do something, he would do it fine," she said. (Id. at 144.)

Penniston met with Joseph about the status report grades and the reports of him sleeping in class. The counselor testified that Joseph talked a lot about not keeping up with the reading and thus being bored in Novels. (Tr. 3/5/96 at 38.) Joseph said his job outside school and his friends were most important to him, and school was not a priority. (Id.) Penniston said he did not contact Joseph's parents himself at the time of the first status report because he felt "that Joe just needed to make some better decisions for himself and to motivate himself in [the] classroom." (Id. at 42.) Also, the volume of status report grades of "D" or "F" among all students is quite high, according to Penniston; he estimated 600 individual failing grades among the 598 students at East Troy at the last status report. (Id. at 41; see also Vol. 3, Ex. 18h[26–50] (East Troy '93–'94 status report grades).)

On November 17, 1993, Hoffman attended a parent-teacher conference at the school. According to plaintiff, Joseph's homeroom teacher, John Gruber, told him that "there's a good chance [Joseph is] using drugs." (Tr. 4/30/96 at 116.) Gruber denies saying this, but testified that he suggested the parents see someone in the guidance office if they were concerned about Joseph using drugs. (Tr. 3/06/96 at 103, 94–95)

After talking to other teachers at the same parent-teacher conference, Hoffman did meet with Penniston that night. Plaintiff testified that he discussed Joseph's

school performance with Penniston and told him that Joseph had taken the family car without permission and that he was seeing a therapist. (Tr. 4/30/96 at 117–19.) Penniston testified that the main issues discussed were Joseph's working hours at Sentry, his use of the family car, and how these factors were affecting his school performance. (Tr. 3/5/96 at 45–47.) Penniston said that Hoffman told him that Joseph was doing very well at Sentry, and his responsibility and hours had increased. (*Id.* at 47.) Plaintiff testified that his son was working 15 to 20 hours a week at this time. (Tr. 4/30/96 at 149.) Although Hoffman says he never really thought that Joseph's lack of alertness at school was due to his work hours, he did suggest to Penniston and other teachers that if Joseph's grades did not improve his hours at Sentry would be cut. (*Id.* at 155.) Penniston promised to meet with Joseph again to discuss his parents' concerns.

On November 29, 1993, Joseph had his first session with a different therapist, Dr. Richard Turcott. Hoffman had arranged this meeting due to dissatisfaction with the prior therapist. Dr. Turcott's initial diagnosis was depression, and antidepressants were recommended. Dr. Turcott continued to treat Joseph through February 26, 1994.

On December 1, 1993, Hoffman and Penniston spoke again over the phone about Joseph. Penniston had not yet talked to Joseph since the parent-teacher conference two weeks earlier. Hoffman was surprised and disappointed by this and says he "wrote [Penniston] off," feeling there was no reason to deal with him anymore. (Tr. 4/30/96 at 122.) Penniston testified that during this conversation Hoffman conveyed to him his belief that the primary cause of Joseph's academic problems was twofold: Joseph's excessive work hours and his heavy use of the car. (Tr. 3/6/96 at 43.) The fact that Joseph might be clinically depressed was also discussed, though not in great detail. (*Id.* at 24–25.) Penniston thinks plaintiff may have told him

about Joseph's "police contacts" (for what infraction remains unclear) during the conversation. (*Id.* at 26.) At no point, however, did Penniston receive any specific information about Joseph from law enforcement or social service agencies. (Tr. 3/5/96 at 50–51.)

On December 1, Hoffman and Penniston also discussed an exchange of information between the counselor and Joseph's therapist. Hoffman's notes from that conversation suggest that plaintiff knew that in order for information to be exchanged he would have to initiate a written release. (Vol.2, Ex. 17d[3].) Penniston also said he discussed that precondition with Hoffman. (Tr. 3/5/96 at 63.) The written release and the exchange of information between Penniston and Dr. Turcott was never pursued by plaintiff.

After December 1, Penniston did meet with Joseph several times to discuss academic and personal issues. Penniston also recalls being in fairly frequent contact with plaintiff between November 1993 and February 1994. (Tr. 3/6/96 at 26.) Plaintiff says he never heard anything from Penniston about Joseph from December 1 until after his son had left East Troy the following February. (Tr. 4/30/96 at 140.)

The record also reflects that plaintiff called several of Joseph's teachers after the December 1 conversation with Penniston, and the calls were promptly returned. The phone message slips suggest that Joseph's performance in certain classes was perhaps improving slightly and at least not deteriorating at that time. (Vol.2, Ex. 17e, 17f[4, 5].) Joseph, in fact, failed only one class in the fall semester. His first semester grades at East Troy were: "C –" in Novels; "C" in Social Studies; "C" in Physics; "F" in Advanced Algebra; and "C –" in Computers. (Vol.2, Ex. 13aj[35].)

The second semester began in approximately the third week of January 1994. On February 4, 1994, Joseph's speech teacher, Cheryl Farrar, submitted a disci-

plinary referral on Joseph for sleeping in class multiple times. Farrar testified that Joseph told her he was working 40 hours a week, and she had no reason to disbelieve him.

On February 8, 1994, Joseph was admitted for an inpatient psychiatric evaluation at Charter Hospital of Milwaukee. Hoffman says he and his wife took this action because Joseph ran away one weekend and because they found marijuana in his bedroom. The District came to know of Joseph's admission at Charter via a request for information from the hospital. Penniston recalls being very surprised when he got the news.

On February 28, 1994, Joseph was enrolled in an inpatient, residential treatment program at the DeSisto School ("DeSisto") in Massachusetts immediately upon his release from Charter. The District was notified of this placement via DeSisto's request for release of Joseph's school records and transcripts.

At no time did Dr. Dries, Dr. Turcott, or any of the other therapists at Charter Hospital refer Joseph for an EEN evaluation. Special education was never mentioned in any of Joseph's mental health treatment notes. Plaintiff and Joseph's mother La Verne, a psychiatric nurse, did not refer Joseph for an EEN evaluation before he left East Troy. Plaintiff testified that the District never provided them any information about EEN referral or M-team evaluation procedures, other than the general information about special education in the East Troy High School Coursebook.

**B. Facts Relevant to Incomplete M–Team Evaluation**

In August 1994, Hoffman asked the District to have Joseph evaluated and identified as seriously emotionally disturbed. The request was treated as an EEN referral, triggering the District's obligation to conduct an M-team evaluation of Joseph and send his parents a copy of a placement offer for him within 90 days. *See* Wis.Ad-min.Code § PI 11.03(g) (1990). At that time, Joseph had been in residence and attending school at DeSisto for more than five months, and plaintiff had already signed a contract for Joseph's 1994–95 school year at DeSisto. (Tr. 4/30/96 at 167.)

Hoffman admits that he had no expectation when he submitted the EEN referral that Joseph would come back to East Troy and enroll in a special education program in the District. (*Id.* at 166.) Plaintiff says that his sole motivation "was to see if the school system would pay for part of Joe's costs at the DeSisto." (*Id.* at 127.) He says he first learned of the possibility of reimbursement from the District for the cost of his son's private tuition at a parent group meeting for parents of DeSisto students, some time after Joseph enrolled there. (*Id.* at 129–30.)

On September 9, 1994, Philip Knobel, Director of Special Education for the Board, responded by letter to Hoffman's initial request that Joseph be evaluated. The letter states:

Dear Mr. Hoffman:

We have discussed your son, Joe, on two occasions recently and on August 30th you made a referral for evaluation on him. Enclosed please find a permission for evaluation which you must sign and return to us before we can do the evaluation. I would also request that you contact all agencies that have been involved with your son and have the records sent to us. We would then review these records and determine if additional evaluations will need to be completed.

(Vol.2, Ex. 16a[1].)

On September 23, 1994, Knobel wrote to plaintiff again, saying that the signed permission had been received, but reiterating that the Board needed "records of all previous evaluations that have been done on Joe" and "records from his previous school experiences." (Vol.2, Ex. 16d[4].) "After

receiving this information we will determine what evaluations we will need to complete and how they may be done." (*Id.*)

By October 3, 1994, Knobel received a letter from Dr. Turcott, indicating that in order for information regarding Joseph's treatment to be sent to the school as requested by La Verne Hoffman, Joseph himself would have to execute a release. (Vol.2, Ex. 16e[5].) Dr. Turcott also emphasized that the release would have to be specific about what information was being requested, for what purpose and who would have access to it. (*Id.*)

On October 20, 1994, Knobel wrote to plaintiff, enclosing a release of information form that Joseph and one of his parents could sign and send to Dr. Turcott. (Vol.2, Ex. 16f[6].) The release form sent by Knobel specifically requested and authorized the release of the following information: medical and/or related health records; psychological evaluations or social work reports; and appropriate agency reports, including psychiatric reports. (See Vol. 2, Ex. 16j[8].) The form indicates that the information would be used by the Board to determine if Joseph was eligible for special education services. (*Id.*) Also enclosed with the release form were two copies of a children's personality inventory to be completed and returned by Mr. and Mrs. Hoffman. Finally, Knobel's October 20 letter informed Hoffman that "[a]t this time we have not received any records on Joe." (Vol.2, Ex. 16f[6].)

On October 30, 1994, Hoffman replied to Knobel, indicating that he had also signed a release form provided by the Center for Psychotherapy in Massachusetts, where Joseph was currently being treated, but that the institution was nevertheless reluctant to release information. (Vol.2, Ex. 16g[7].) Hoffman wrote that he would try to alleviate this problem by talking directly to the director. Plaintiff also stated his surprise that Knobel had not yet received Joseph's academic records and memorialized his understanding, based on a tele-

phone conversation, that the Board would obtain Joseph's school records directly from East Troy. (*Id.*) As Knobel remembers the conversation, he told Hoffman (on September 26, 1994) that he would check with the District, but that he thought all of Joseph's records had been transferred to DeSisto when he withdrew from East Troy. (Knobel Aff., Vol. 2, Ex. 15j[10].)

The signed release of information form for Dr. Turcott was returned to Knobel by November 14, 1994. On November 15, Knobel sent the form—bearing plaintiff's signature and specifically requesting all of Joseph's medical or psychiatric records and evaluations—to Dr. Turcott, with a cover letter asking that he forward the requested information. (Vol.2, Ex. 16I[10].) Dr. Turcott appears to have received the release form on November 16. However, two days prior to that, Dr. Turcott had received a letter from plaintiff and his wife with these additional instructions about releasing information to the Board:

Dear Dr. Turcott:

. . .

We think that the school evaluation team should initially receive only a general statement documenting Joe's condition including your opinion that he needs to be placed in a residential treatment center, similar to the DeSisto School, which provides the therapy, direction and protection provided by the DeSisto School. I am truly concerned that individuals in the school system, who are not professionals in the psychiatric field, may compromise the confidentiality of any specific information we provide.

We are in the process of hiring a lawyer to represent our interests in this matter and would therefore appreciate receiving the requested information directly from you so he can review it before we submit it to the school system.

(Vol.2, Ex. 16i[9].)

Knobel received Dr. Turcott's response to the Board's request for information and

medical records seven weeks later, on January 6, 1995. (Vol.2, Ex. 16p[14].) The response, a one-page letter, is actually dated December 16, 1994, presumably because it was first reviewed by the Hoffmans and their lawyer as requested. Dr. Turcott's letter states:

Dear Mr. Knobel

... It is believed at this time that [Joseph] has a severe emotional disturbance and needs to be placed in residential treatment ...

...

It is my medical and psychiatric opinion that Joe needs to be in a residential treatment center similar to the DeSisto School which provides the therapy direction and protection provided by such a school at this time ...

(*Id.*) Turcott's letter provides some additional information about the services offered at DeSisto, but nothing else about Joseph's psychological or emotional health. At the time of this letter, moreover, Turcott had not treated Joseph for more than nine months.

Meanwhile, by the end of November, Knobel had requested an extension of the 90–day period in which to evaluate Joseph. (*See* Vol. 2, Ex. 16m, n[11, 12].) Pursuant to regulations, the request was first made to the Hoffmans (who did not respond for several weeks) and then to Juanita S. Pawlisch, assistant superintendent at the Division of Learning Support, Equity and Advocacy, Wisconsin Department of Public Instruction ("WDPI"). *See* Wis.Admin.Code § PI 11.06(5) (1990). Dr. Pawlisch granted the extension on December 21, 1994, giving the Board until February 28, 1995 to complete the evaluation. (Vol.2, Ex. 16q[15].) She also found that the Board and the District had acted in good faith, and there was good cause to grant the extension based on the delay in receiving Joseph's academic and medical records. (*Id.*)

In the first week of January 1995, the Board had also received plaintiff's request for a due process hearing regarding the District's alleged failure to refer Joseph for an EEN evaluation and to develop an accommodation plan for him. *See* 20 U.S.C. § 1415(f); Wis.Admin.Code § PI 11.10 (1990). Over the next six months, even as the Board requested and was granted two more extensions to conduct an M-team evaluation of Joseph, the parties simultaneously became involved in selecting a hearing officer, exchanging discovery, compiling witness lists, and other prehearing activities.

On February 20, 1995, plaintiff requested an additional answer sheet for the personality inventory on Joseph that Knobel had asked both parents to complete the previous October, as one answer sheet had been misplaced. (Vol.2, Ex. 16t[18].) Both completed inventory answer sheets were returned to Knobel by the Hoffmans on March 29, 1995, five months after they received the materials. (Vol.2, Ex. 14o[17].)

On February 21, 1995—still having received only Dr. Turcott's one-page letter and none of Joseph's academic or medical records from DeSisto or the affiliated psychotherapy center—the Board requested another extension. (Vol.2, Ex. 16u[19].) Dr. Pawlisch granted the extension on March 3, 1995. (Vol.2, Ex. 16x[22].) The Board was given until May 29, 1995 to complete its M-team evaluation. Pawlisch again found that defendant had acted in good faith and that there was good cause to grant the extension. (*Id.*)

By April, Joseph's academic and medical records from DeSisto still had not been received by the District or the Board. At a prehearing conference on April 11, 1995 before the administrative hearing officer, Hoffman agreed to pursue release of the records with DeSisto and to inform the District when the records could be expected. (Vol.2, Ex. 16al[33].) The request for records from DeSisto was reiterated in a formal discovery request from the District on May 18, 1995. (Vol.2, Ex. 15a[1].)

On June 2, 1995, Knobel requested a third extension from Dr. Pawlisch for time to evaluate Joseph because the academic and medical records from DeSisto—where the student had been enrolled for the previous fifteen months—had still not arrived. (Vol.2, Ex. 16ap[37].) An extension until August 27, 1995 was promptly granted for the same "good cause" as before, and the Board was found to have been acting in good faith. (Vol.2, Ex. 16aq[38].)

DeSisto finally forwarded Joseph's records to Hoffman's attorney on June 27, 1995, expressing their apologies for the delay. (Vol.2, Ex. 16as[40].) The materials included Joseph's academic records prior to his placement at DeSisto and therapeutic records from his time at DeSisto, including evaluations and treatment summaries by several staff psychiatrists and therapists who had worked with Joseph over the past sixteen months. (*Id.*) Joseph's academic materials from his time at DeSisto were sent within the next few days. The Board ultimately received all these materials on July 5, 1995. (Vol.2, Ex. 15f[6].)

Joseph Hoffman, who had turned eighteen the previous October, withdrew himself from DeSisto on July 4, 1995. He never graduated.

The M-team evaluation of Joseph was never completed, and he was never formally declared emotionally disturbed or a student with exceptional educational needs.

### III. PROCEDURAL HISTORY

After various delays, the first phase of the due process hearing requested by plaintiff was finally held on March 5, 6, 26 and 27, 1996; and April 30, 1996. Based on these proceedings, the hearing officer concluded that: (1) the District had reason to know that Joseph was eligible for an EEN referral and failed to fulfill its legal responsibilities in this regard; and (2) that Joseph was a student with emotional disabilities requiring special education. The second phase of the hearing was held on May 30, 1996; July 29, 1996; and August 1

and 2, 1996. Afterward the hearing officer concluded that: (1) based on a preponderance of the evidence, DeSisto provided Joseph with an appropriate educational program and educational benefits; and (2) based on equitable considerations, the District should reimburse plaintiff for the cost of Joseph's education and therapeutic expenses at DeSisto, or $84,378.54.

The District appealed the hearing officer's decision, challenging all four conclusions. The decision of the reviewing officer ("RO"), dated July 22, 1997, reversed with respect to all issues. *See East Troy Community Sch. Dist.*, 26 IDELR 515 (1997) ("RO Decision"). The RO found that the hearing officer had erred in the first phase of his decision, by making findings unsupported by the preponderance of evidence standard. Specifically, the RO concluded that: (1) the District had no reasonable cause to suspect that Joseph was a child with exceptional educational needs; (2) while there were minor procedural violations by the District and the Board, these violations did not deny Joseph a free appropriate public education; and (3) Joseph was not an emotionally disturbed child who required special education during the period he was enrolled at East Troy. Based on these conclusions, the questions of whether DeSisto provided an appropriate educational program for Joseph and whether his parents were therefore entitled to equitable reimbursement under the IDEA were rendered moot.

Plaintiff filed this action in federal court, seeking review of the RO's decision.

### IV. STANDARD OF REVIEW

■ This court considers the issues before it under a different standard of review from that governing typical summary judgment motions. Section 1415 of the IDEA allows parties aggrieved by the findings and decision made by a state or local educational agency with respect to "any matter relating to the identification, evaluation, or educational placement of the

child, or the provision of a free appropriate public education to such child" to bring a civil action in federal district court, appealing those findings and decision. 20 U.S.C. § 1415(b)(6), (f) and (i)(2). The IDEA requires a district court reviewing a state administrative decision: (1) to receive the records of the administrative proceedings, (2) to hear additional evidence at the request of any party and, (3) "basing its decision on the preponderance of the evidence, [to] grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B). Here, neither party has asked me to hear additional evidence. The parties' cross-motions for summary judgment are thus simply a procedural vehicle requiring me to decide this case on the basis of the administrative record. *Heather S. by Kathy S. v. State of Wisconsin,* 125 F.3d 1045, 1052 (7th Cir.1997). Despite being termed a "summary judgment," a district court's decision under § 1415(i)(2) should be based on a preponderance of the evidence standard. *Id.* Further, the party challenging the outcome of the state administrative decision bears the burden of proof. *Id.; Board of Educ. of Community Consol. Sch. Dist. 21 v. Illinois State Bd. of Educ.,* 938 F.2d 712, 716 (7th Cir.1991).

■ Section 1415(i)(2), however, is not an invitation for courts "to substitute their own notions of sound educational policy for those of the school authorities which they review." *Board of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). As a general matter, courts should be careful to avoid imposing their view of proper educational methods upon states. *Id.* at 207, 102 S.Ct. 3034. Accordingly, district courts must give "due weight" to the results of the state administrative proceedings, recognizing that courts lack special expertise in the area of educational policy. *Id.; Board of Educ. of Murphysboro Community Unit Sch. Dist. No. 186 v. Illinois State Bd. of Educ.,* 41 F.3d 1162, 1166 (7th Cir.1994). This defer-

ence in matters of educational methodology does not apply to the testimony of witnesses or to evidence in the record—both of which the court must independently evaluate—but to the conclusions of the administrative hearing officers. *Heather S.,* 125 F.3d at 1053. Where, as here, a reviewing officer has reversed the findings and decision of the initial hearing officer, the Seventh Circuit has concurred with other circuits in concluding that deference is owed only to the final decision of the state authorities. *Id.* at 1053–54; *see also Thomas v. Cincinnati Bd. of Educ.,* 918 F.2d 618, 624 (6th Cir .1990); *Karl v. Board of Educ. of Geneseo Cent. Sch. Dist.,* 736 F.2d 873, 877 (2d Cir.1984) (relying on general principles of administrative law).

Finally, I note that the IDEA grants district courts broad discretion to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B)(iii). The Supreme Court has affirmed the lower courts' conclusion that this language implies "that equitable considerations are relevant in fashioning relief" under the statute. *School Comm. of the Town of Burlington, Mass. v. Massachusetts Dep't of Educ.,* 471 U.S. 359, 374, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985).

## V. APPLICABLE LAW

### A. Reimbursement Under the IDEA

■ Plaintiff argues that he is entitled to reimbursement for the cost of Joseph's education at DeSisto. The Supreme Court approved an implied right of reimbursement under the IDEA in 1985 in *Burlington,* and the statute was since amended to explicitly reflect that right. *See* 20 U.S.C. § 1412(a)(10)(C). *Burlington* held that under the logic of the IDEA a court's authority to grant "appropriate" relief must include "the power to order school authorities to reimburse parents for their expenditures on private special education for a child," if the court ultimately determines that the private placement, rather

than the proposed IEP, is proper under the Act. *Burlington,* 471 U.S. at 369, 105 S.Ct. 1996. The law is clear that reimbursement is appropriate only if a federal court concludes both that (1) the public placement violated the IDEA and (2) the private school placement was proper under the Act. *Florence County Sch. Dist. Four v. Carter,* 510 U.S. 7, 15, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993).

▉ In some cases, such as the one before me, there is no "public placement" as such—because a child was never properly evaluated, or was found not to be disabled, or because an IEP was never developed as called for under the Act. In these cases, the first condition for reimbursement may still be satisfied if the public school district has "defaulted on its obligations under the Act" in some other respect. *Florence County,* at 11, 114 S.Ct. 361.

Although not a reimbursement case, *Board of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), provides the basis for IDEA claims for reimbursement that are premised on procedural violations of the Act, rather than the inadequacy of a public school district's proposed IEP. In *Rowley,* the parents of a hearing-impaired child challenged the appropriateness of a proposed IEP for their daughter that did not provide for an in-class sign language interpreter. *Id.* at 184–85, 102 S.Ct. 3034. In reaching its conclusion that the IEP as proposed was indeed appropriate, the Supreme Court laid down the limited scope of the court's inquiry in cases brought under § 1415(i)(2), seeking review of an unfavorable administrative decision. The court's inquiry is twofold:

First, has the State complied with the procedures set forth in the Act? And second, is the individualized education program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

*Id.* at 206–07, 102 S.Ct. 3034 (footnotes omitted).

*Rowley* thus foregrounded compliance with procedural obligations, finding that the IDEA placed equal emphasis on procedural compliance as on the substantive appropriateness of the proposed IEP. *Id.* at 205–06, 102 S.Ct. 3034. It is worth noting, however, that *Rowley* specifically underlined the importance of the procedural safeguards in § 1415, which are aimed at giving parents and guardians a full measure of participation in the development, revision and judicial review of their childrens' educational programs. *Id.* The rationale behind these particular safeguards, as *Rowley* makes clear, is that full parental participation during a child's evaluation and IEP formulation will advance the substantive goals of the IDEA—the provision of individualized special education to disabled children at public expense.

▉ Although procedural violations stemming from requirements not having to do with parental involvement in the evaluation or IEP process, or from state statutes and regulations governing other aspects of special education in public schools, may establish a basis for IDEA reimbursement claims, the violations must imperil the substantive goals of the Act. In other words, the procedural violation must result in a denial of appropriate educational benefit to the child in question in a manner similar to, or on par with a lack of full parental involvement at the IEP formulation stage. Numerous circuits have affirmed that all procedural violations do not establish a denial of free appropriate public education such that reimbursement is warranted, only those violations that are sufficiently harmful and serious. *See, e.g., Heather S.,* 125 F.3d at 1059; *Doe By and Through Doe v. Metropolitan Nashville Pub. Sch.,* 133 F.3d 384, 388 (6th Cir.1998) (finding that reimbursement may be appropriate

for "sufficiently serious procedural failures by the school district" in conducting child-find procedures); *Ash v. Lake Oswego Sch. Dist.*, 980 F.2d 585, 589 (9th Cir.1992) (agreeing that when a school district has "egregiously violated the procedural requirements" of the IDEA, reimbursement may be called for); *Doe v. Alabama State Dep't of Educ.*, 915 F.2d 651, 662–63 (11th Cir.1990) (holding that proper analysis of procedural violations "considers the harm flowing from the violation in assessing whether relief is appropriate").

## B. Relevant Procedural Requirements

The procedural violations alleged by plaintiff are rooted in the IDEA's "child find" obligations. The Act places an affirmative duty on states to ensure that all disabled children who are in need of special education and related services, even those attending private schools, are "identified, located and evaluated." 20 U.S.C. § 1412(a)(3)(A). How that goal is achieved is left up to the individual states. Wisconsin's approach calls for a combination of special education screening, teacher training, public and parental notice, and a referral and evaluation process.[3]  *See* Wis.Admin.Code §§ PI 11.03, 11.04 (1990). Plaintiff alleges that several specific statutory and regulatory provisions governing these matters were violated by defendants, resulting in their failure to identify Joseph as a disabled child in need of special education.

Most centrally, plaintiff alleges that District staff failed to submit an EEN referral for his son while he was still at East Troy. Section 115.80 of the Wisconsin Statutes requires licensed and certified public school teachers, counselors and nurses (as well as parents, physicians, psychologists and social workers) to refer a child for an EEN evaluation if they have "reasonable cause to believe a child has exceptional educational needs." Wis.Stat. § 115.80(1)(b) (1993). The statutes define "[c]hild with exceptional educational needs" as

> a child *with any of the following conditions*, or such other conditions as the state superintendent determines, *who may require educational services* to supplement or replace regular education:
>
> (a) Orthopedic impairment.
>
> (b) Cognitive disability or other developmental disability.
>
> (c) Hearing handicap.
>
> (d) Visual handicap.
>
> (e) Speech or language handicap.
>
> (f) *Emotional disturbance.*
>
> (g) Learning disability.
>
> (h) Autism.
>
> (j) Traumatic brain injury.
>
> . . .

Wis.Stat. § 115.76(3) (1993) (emphasis added).

The eligibility criteria for the condition of "emotional disturbance" ("ED") are found in § PI 11.35(g) of the Wisconsin Administrative Code. The ED criteria are by nature more subjective and less quantitative than the criteria for other disabling conditions, such as cognitive disability or visual handicap. Taken as a whole,[4] the

---

**3.** State regulations and WDPI policy on special education screening, EEN referrals and M-team evaluations may have been modified in recent years. I cite to the 1990 Wisconsin Administrative Code and the 1993 Wisconsin Statutes, whose relevant provisions were in effect during 1993–95.

**4.** Section PI 11.35(g) of the Wisconsin Administrative Code states in full:

(g) *Emotional disturbance.* 1. Classification of emotional disturbance as a handicapping condition is determined through a current, comprehensive study of a child, ages 0 through 20, by an M-team.

2. Emotional disturbance is characterized by emotional, social and behavioral functioning that significantly interferes with the child's total educational program and development including the acquisition or production, or both, of appropriate academic skills, social interactions, interpersonal relationships or intrapersonal adjustment. The condition denotes intraindividual and interindividual conflict or variant or deviant behavior or any

ED criteria are instructive, descriptive—suggesting the terrain of ED through behavioral patterns or prototypes rather than marking it with fixed boundaries. That said, the core of the ED "definition" states: "Emotional disturbance is characterized by emotional, social and behavioral functioning that significantly interferes with the child's total educational program and development including the acquisition or production, or both, of appropriate academic skills, social interactions, interpersonal relationships intrapersonal adjustment." Wis.Admin.Code § PI 11.35(g)(2) (1990). Following subsections add more specific focus to this standard and offer examples of behaviors indicative of emotional disturbance.

To summarize, for plaintiff's claim that the District failed in its referral obligations under § 115.80 to be true, the staff and teachers of East Troy must have had "reasonable cause to believe" both that Joseph was emotionally disturbed under the above standard and that he may have been in need of special education. Plaintiff also alleges that defendants committed other procedural violations that prevented an earlier EEN referral for Joseph.

Section PI 11.03(1) of the Wisconsin Administrative Code requires that school boards maintain "policies and procedures

combination thereof, exhibited in the social systems of school, home and community and may be recognized by the child or significant others.

3. All children may experience situational anxiety, stress and conflict or demonstrate deviant behaviors at various times and to varying degrees. However, the handicapping condition of emotional disturbance shall be considered only when behaviors are characterized as severe, chronic or frequent and are manifested in 2 or more of the child's social systems, e.g., school, home or community. The M-team shall determine the handicapping condition of emotional disturbance and further shall determine if the handicapping condition requires special education. The following behaviors, among others, may be indicative of emotional disturbance:

a. An inability to develop or maintain satisfactory interpersonal relationships.

b. Inappropriate affective or behavioral response to what is considered a normal situational condition.

c. A general pervasive mood of unhappiness, depression or state of anxiety.

d. A tendency to develop physical symptoms, pains or fears associated with personal or school problems.

e. A profound disorder in communication or socially responsive behavior, e.g., autistic-like.

f. An inability to learn that cannot be explained by intellectual, sensory or health factors.

g. Extreme withdrawal from social interaction or aggressiveness over an extended period of time.

h. Inappropriate behaviors of such severity or chronicity that the child's functioning significantly varies from children of similar age, ability or educational experiences and opportunities, and adversely af-

fects the child or others in regular or special education programs.

4. The operational definition of the handicapping condition of emotional disturbance does not postulate the cause of the handicapping condition in any one aspect of the child's make-up or social systems.

5. The manifestations of the child's problems are likely to influence family interactions, relationships and functioning or have an influence on specific individual members of the family. It is strongly recommended that extensive family involvement or assistance be considered in the evaluation and programming of the child.

6. The handicapping condition of emotional disturbance may be the result of interaction with a variety of other handicapping conditions such as learning, physical or mental disabilities or severe communication problems including speech or language.

7. An M-team referral for suspected emotional disturbance may be indicated when certain medical or psychiatric diagnostic statements have been used to describe a child's behavior. Such diagnoses may include but not be limited to autism, schizophrenia, psychoses, psychosomatic disorders, school phobia, suicidal behavior, elective mutism or neurotic states of behavior. In addition, students may be considered for a potential M-team evaluation when there is a suspected emotional disturbance, who are also socially maladjusted, adjudged delinquent, drop-outs, drug abusers or students whose behavior or emotional problems are primarily associated with factors include cultural deprivation, educational retardation, family mobility or socio-economic circumstances, or suspected child abuse cases. Wis.Admin.Code § PI 11.35(g) (1990).

for locating and screening" all transfer pupils and that the boards ensure that an EEN referral is made whenever "there is reasonable cause to believe" that a screened child has exceptional educational needs. Wis.Admin.Code § PI 11.03(1)(c), (g) (1990). Plaintiff alleges that the District's screening policies were deficient or improperly followed in Joseph's case.

Section PI 11.03 also requires boards to provide "information and inservice opportunities" to all licensed staff, to "familiarize them" with EEN behavioral descriptors and referral procedures. Wis.Admin.Code § PI 11.03(1)(e), (2)(c) (1990). Plaintiff alleges that this staff training was not provided at East Troy, causing teachers to fail to refer Joseph for EEN evaluation.

Section PI 11.03(2) further provides that, at least annually, school boards must inform persons required to make EEN referrals under § 115.80(1)(a), Wis.Stat.—which includes parents—about EEN referral and M-team evaluation procedures. Wis.Admin.Code § PI 11.03(2)(d) (1990). Plaintiff alleges that defendants failed to properly inform him of these procedures and that he was therefore prevented from making an EEN referral for Joseph while his son was at East Troy.

Finally, § PI 11.04 states that when an EEN referral is received, a school board "shall appoint an M-team to conduct an M-team evaluation of the child to determine whether the child is a child with EEN." Wis.Admin.Code § PI 11.04(2)(a) (1990). Section PI 11.03(2) requires that the initial results of this evaluation be sent to the child's parent within 90 days of the date the referral was received. Wis.Admin.Code § PI 11.03(2)(g) (1990). Plaintiff alleges that these procedures were violated because an M-team evaluation of Joseph was never begun or completed by defendants.

## VI. ANALYSIS

### A. Failure to Submit an EEN Referral

■ I agree with the RO that the preponderance of the evidence establishes that District staff had no reasonable cause to believe that Joseph was a student with exceptional educational needs. *See* RO Decision, 26 IDELR at 518–21.

The most serious problems exhibited by Joseph during his time at East Troy were a tendency to sleep in several classes and declining grades. The record shows that both problems were promptly noted by Joseph's teachers and reported to his parents and to Penniston. Three teachers and Penniston all testified that when Joseph was asked about sleeping in class he was polite and responsive and gave heavy work hours as an excuse. This is an unfortunate but not unheard of situation with many students who work. Significantly, in his many conversations with East Troy staff, Joseph's father did nothing to dispel their sense that Joseph was simply working too many hours—this despite the fact that he now says he had private doubts about that explanation. Penniston and Schultz testify to numerous conversations with Hoffman in which the topic of Joseph's job was discussed, with the understanding that Joseph may have been working too much. Penniston's early conversation with Joseph suggested other plausible factors as well: he was bored and apathetic about schoolwork and prioritizing poorly.

Nevertheless, Joseph appears to have been able to curb his drowsiness and apathy enough to pass all but one of his classes the first semester. Though not stellar and certainly not reflective of his full potential, Joseph's mostly passing grades at East Troy suggest that he was still receiving "educational benefit" from his classes, at least as understood under the IDEA. *See Rowley*, 458 U.S. at 203, 102 S.Ct. 3034 ("The grading and advancement system [ ] constitutes an important factor in determining educational benefit.") The decline in Joseph's grades at East Troy, although not insignificant, was also something that could reasonably be attributed to other factors. Gary E. Myrah,

director of special education services in a neighboring public school district, testified that it was quite typical for students who received very good grades in parochial school "to have kind of a downturn their first semester" in public high school. (Tr. 3/26/96 at 42.) No one disputes that Joseph's grades bore watching. After the first troubling status report grades, Penniston did speak to Joseph, and Hoffman was notified—even though apparently hundreds of East Troy students receive failing status report grades. And Joseph's first semester report card at East Troy, reflecting just one failed class, was finally issued only on January 24, 1994. (Vol. 2, Ex. 13aj [35].) Two weeks later Joseph was gone from the school.

In addition to sleeping in class and declining grades, plaintiff claims that Penniston knew about other problems Joseph was having, such as that he was seeing a therapist for depression, he was keeping the car out late, he was fighting a lot with his parents, and he had experienced a few "police contacts." The information on police contacts in the record is very sketchy; it certainly does not suggest that Penniston had reason to believe, based on what plaintiff told him, that Joseph was a budding delinquent. Most importantly, plaintiff did not arrange for Penniston and Joseph's therapist to share information, although Hoffman was aware that he would have to initiate a written release for this to occur. Plaintiff's mere mentioning of a therapist and possible depression, as compared to his significant and ongoing discussion of Joseph's work hours and car usage, understandably did not leave Penniston with the impression that Joseph's problems were mainly psychiatric.

Plaintiff argues that only in combination do these various manifestations of Joseph's emotional condition provide a basis for a suspicion of ED and thus an EEN referral. My own reading of the ED criteria does not lead me to this conclusion. But more importantly, I agree with the RO that the overwhelming weight of the recorded testimony—from educational experts, special services staff, teachers, psychologists—indicates that based on what District staff knew they had no reasonable cause to suspect that Joseph was emotionally disturbed. See RO Decision, 26 IDELR at 520.

The only expert to conclude that there was a basis for such a suspicion was Amy Schlieve, an adjunct instructor for the University of Wisconsin Eau Claire special education department, with a masters degree in ED behavior disorders. Schlieve was presented with a hypothetical set of facts, meant to represent the District's knowledge of Joseph when he was at East Troy, and she concluded that those facts would lead her to make an EEN referral. (Tr. 4/30/96 at 24.) As I read the record, the hypothetical was a bit loaded. Moreover, Schlieve believes that children with "internalizing behavior" like Joseph are under-referred because they are not disruptive in class; her advice is always to err on the side of a referral. (Id. at 16, 20.) This methodological choice may be defensible, but it is certainly that—a methodological choice.

Schlieve's conclusions were contradicted by every other expert who testified, several of whom appear to have more direct experience with the EEN referral and M-team evaluation process in Wisconsin public schools than Schlieve. (Compare Myrah resume, Vol. 2, Ex. 14q [19]; Schlieve resume, Vol. 2, Ex. 14s [21]; Wilde resume, Vol. 2, Ex. 18c [3–5].) Particularly persuasive in their testimony that a referral was not in order were Myrah and Dr. Jerald K. Wilde, the East Troy school psychologist who has sat on hundreds of ED M-teams in his career and has written extensively about adolescent depression and emotional disorders. (Tr. 3/27/96 at 26, 45–51.) Both men were presented with substantially the same hypothetical information as Schlieve, closely approximating what was known about Joseph during his time at East Troy, and both emphatically

concluded that ED was not suggested and an EEN referral was not a necessary or even wise early response. (Tr. 3/26/96 at 81–84; Tr. 3/27/96 at 93–94.)

Both Myrah and Dr. Wilde emphasized the importance of "pre-referral strategies," or other types of intervention aimed at helping troubled or faltering students that would not see them labeled "emotionally disturbed." (Tr. 3/26/96 at 54–57, 83–84, 100–101; Tr. 3/27/96 at 36–37.) Whereas Schlieve would err on the side of an immediate referral, there are sound fiscal and educational reasons to adopt a more conservative approach to triggering the whole EEN/M-team evaluative apparatus each time a student demonstrates academic or emotional problems. It appears that the District was hewing to this philosophy, later articulated clearly in at least one WPDI bulletin cited by the R.O.[5] *See* WPDI Bulletin No. 96.06 (1996); RO Decision, 26 IDELR at 521 ("One of the new objectives announced by DPI is to reduce inappropriate referrals and the labeling of children unnecessarily as special education students.") Not only do I find the District's methodological choice in this matter eminently reasonable, I am required to defer to it. *See Rowley*, 458 U.S. at 206, 102 S.Ct. 3034.

The record shows that Joseph's teachers promptly relayed information to Penniston and to the Hoffmans, and that Penniston tried to counsel Joseph and to act as a bridge between parents and son. These were clearly pre-referral interventions and entirely appropriate under the circumstances. There is every reason to believe that, had Joseph stayed at East Troy and his problems continued or become more pronounced, other strategies—even including an EEN referral—*may* have become appropriate. But the second semester had scarcely begun when Joseph withdrew from the District. Given this very brief timeline and the reasonable attempt at pre-referral intervention, I cannot find that the District was delinquent in not submitting an EEN referral for Joseph.

Even if Wisconsin disfavored pre-referral strategies, the evidence still establishes that District staff did not have enough specific information about Joseph to suggest the need for an EEN evaluation. Plaintiff discounts what is clearly the preponderance of opinion testimony on this point by arguing that virtually every witness except for Schlieve was operating under a deluded notion of what the precise definition of ED was. Specifically, plaintiff highlights the following portion of the ED eligibility criteria: "[T]he handicapping condition of emotional disturbance shall be considered only when behaviors are characterized as severe, chronic *or* frequent and are manifested in 2 or more of the child's social systems, e.g., school, home or community." Wis.Admin.Code § PI 11.35(g)(3) (1990) (emphasis added). Plaintiff then parses the testimony of various witnesses in an attempt to show that their conclusions about Joseph's ED eligibility were driven by an improper reading of the above phrase as "severe, chronic *and* frequent."

Plaintiff's argument is unpersuasive for several reasons. First, I have looked closely at the testimony, and there is no indication that this misstatement (where it even occurred) amounted to a misunderstanding that was central to any witness's conclusion that Joseph was not ED. Second, the sentence on which plaintiff focuses needs to be read in the context of the entire section on ED eligibility.

The basic ED descriptive standard is set out in subsection (2):

2. Emotional disturbance is characterized by emotional, social and behavioral functioning that *significantly interferes* with the child's total educational

---

5. The IDEA itself calls for a "least restrictive environment" approach to special education. *See* 20 U.S.C. § 1412(a)(5). This philosophy implicitly disfavors the unnecessary stigmatizing of disabled children by requiring their education, "[t]o the maximum extent appropriate," in regular classes with non-disabled children. *Id.*

program and development including the acquisition or production, or both, of appropriate academic skills, social interactions, interpersonal relationships or intrapersonal adjustment. The condition denotes intraindividual and interindividual conflict or variant or deviant behavior or any combination thereof, exhibited in the social systems of school, home and community and may be recognized by the child or significant others.

Wis.Admin.Code § PI 11.35(g)(2) (1990) (emphasis added).

Plaintiff's argument is drawn from subsection (3), which actually creates a *limitation* on the applicability of the subsection (2) standard. Acknowledging that all children occasionally exhibit deviant behaviors, subsection (3) cautions: "However, the handicapping condition of emotional disturbance shall be considered *only when* behaviors are characterized as severe, chronic or frequent ..." *Id.* (emphasis added). This does not mean that emotional disturbance shall be considered *whenever* behaviors are characterized as severe, chronic or frequent. In other words, if the child's behavior does not match the basic ED descriptive standard—behavioral functioning that significantly interferes with a child's education—it matters little that it survives exclusion under the more specific and heightened standard of subsection (3).

Subsection (2) is an unavoidably fuzzy standard. Not surprisingly, educators and M-team evaluators have sought guidance in subsection (3)'s more specific list of typical ED behaviors or indicators, and on the limiting focus on behaviors that are "severe, chronic or frequent" and which occur in more than one social field. The WPDI evaluation guide for assessing ED further fleshes out the § Pl 11.35(g) eligibility criteria in ten detailed pages, offering more specific examples of characteristic ED behavior. *See* WDPI, *Educational Assessment of Emotional Disturbance: An Evaluation Guide* 20–29 (1990). With all this profusion of regulatory guidance, the basic standard remains fuzzy but com-

monsensical: an ED child's behavioral problems must be unusually serious as compared to the majority of his peers and must present a significant impediment to learning. The record indicates that defendants' witnesses implicitly applied this standard when they found that Joseph's behavior at home, at school and in the community was simply not sufficiently serious to give rise to a suspicion of ED. (*See, e.g.*, Tr. 3/26/96 at 44–49; Tr. 3/27/96 at 29–33, 79, 85.)

The preponderance of evidence thus convinces me that defendants had no reasonable cause to believe Joseph was emotionally disturbed and required special education and no obligation to submit an EEN referral on his behalf. Two administrative decisions with similar facts lend support to this conclusion. *See Huntsville City Bd. of Educ.*, 22 IDELR 931, 935 (1995) (finding that school board had no reason to conclude that difficult child with fluctuating grades and in conflict with parents needed special education evaluation); *Board of Educ. of the Midland Pub. Sch.*, 25 IDELR 669, —— (1996) (finding that school district was under no obligation to refer when child's behavior in school "was certainly not of sufficient gravity or uniqueness to lead his teachers or other staff to suspect a disability."). *See also cf. Rodiriecus L. v. Waukegan Sch. Dist. No. 60*, 90 F.3d 249, 254 (7th Cir.1996) ("[I]t is apparent that the school officials had neither knowledge nor reasonable suspicion to base a rational decision that Rodiriecus L. was in fact disabled.").

**B. Inadequate EEN Screening and Teacher Training**

The Wisconsin ED evaluation guide provides a brief description of a classroom screening process based on a "match-mismatch model." WDPI, *Educational Assessment of Emotional Disturbance: An Evaluation Guide* 3–4 (1990). In this model, teachers look for differences between their own expectations, based on experience with many students, and the

actual performance or behavior of individual students. If a student's behavior does not match expectations, the teacher should try to resolve the problem with the student and parents before resorting to an EEN referral. Several of Joseph's teachers followed this basic strategy in that they identified Joseph as having certain problems, spoke to him about it, called his parents and passed on information to Penniston. *See* RO Decision, 26 IDELR at 519. Again, Joseph left East Troy before this pre-referral screening process had run its course.

■ In addition, when Joseph first transferred to East Troy he filled out a transfer student screening form, and he and his father met with Penniston. The intake form specifically requested information on learning and behavioral disabilities. Neither Hoffman nor Joseph took that opportunity, in writing or in person, to alert Penniston to any emotional, academic or behavioral concerns with respect to Joseph. Based on what he learned at the intake meeting, Penniston certainly had no cause to believe that Joseph might have exceptional educational needs. These facts alone establish that the District committed no procedural violations related to screening under § PI 11.03(1), Wis.Admin.Code. Furthermore, plaintiff cannot now claim that basic screening procedures such as these are inadequate when he directly resisted early efforts to screen for exceptional educational needs in his son.

However, I disagree with the RO's conclusion with respect to the adequacy of teacher training on ED eligibility criteria. *See* RO Decision, 26 IDELR at 519. Regulations require licensed staff to be "familiarized" with EEN behavioral descriptors and referral procedures. Wis.Admin.Code § PI 11.03(1)(e), (2)(c) (1990). As I suggested above, I do not believe that random misstatements about the proper conjunction in "severe, chronic or frequent" amounts to a lack of familiarity with the basic behavioral markers of ED. Further, the testimony of several of Joseph's teachers leads me to conclude that most teachers were reasonably familiar with behavior indicating exceptional educational needs. (*See, e.g.,* 3/5/96 at 77–79.)

Whether this familiarity resulted from experience with EEN students or from concerted training by the District and the Board is unclear from the record. I think the question is moot in this instance, however. Based on what they observed of Joseph at school, even a teacher intimately familiar with and highly trained regarding ED eligibility criteria would not have seen fit to submit a referral on Joseph. Penniston himself, who was very aware of ED behavioral markers and who possessed the most information about Joseph among the East Troy staff, did not have reasonable cause to suspect ED.

## C. Failure to Inform Parents of Referral/Evaluation Procedures

■ I agree with the RO that Joseph's parents were not adequately informed about EEN referral and M-team evaluation procedures, as required by Wis.Admin.Code § PI 11.03(2)(d) (1990). I also agree that this procedural violation did not result in a denial of appropriate educational benefit to Joseph; nor was it sufficiently harmful or serious to warrant reimbursement, especially in light of equitable considerations. *See* RO Decision, 26 IDELR at 519.

The record suggests that even if Hoffman had been informed in August 1993, when Joseph first entered East Troy, that as a parent he could submit a referral and compel the District to evaluate his son for exceptional educational needs, he would not have done so. At the intake session, Hoffman withheld from Penniston even minimal information about previous problems with Joseph, in order to give his son a "fresh start" at his new school. In December 1993, when Penniston suggested that he and Dr. Turcott share information about Joseph, Hoffman failed to pursue this avenue.

Hoffman became keen on having his son classified as emotionally disturbed and in need of special educational services only after Joseph had left East Troy, and for strictly financial motives. Hoffman admits that when he referred Joseph in August 1994 he had no expectation that his son would return to the District and participate in whatever accommodation plan was developed for him. What plaintiff sought was IDEA reimbursement for the cost of Joseph's tuition at DeSisto. Even after the referral was made, the record does not suggest a genuine desire on the part of plaintiff to assist the Board in actually assessing his son's educational needs. The Hoffmans' November 1994 letter to Dr. Turcott, which quietly blocked any useful disclosure of medical information to the Board, is the best example of this cynical approach to the evaluation process.

Plaintiff points to a recent administrative decision finding that a school district's procedural failure to notify parents of their right to have their child evaluated for special educational needs did result in the denial of a free appropriate public education. *See Birmingham Pub. Sch.*, 29 IDELR 765 (1998). However, the facts of that decision present a much more egregious example of failure to inform parents of their IDEA rights, in the face of clear indications that the child was emotionally disturbed and eligible for special education. In that decision, the Birmingham school district was aware, over a period of several months, that the child in question was refusing to attend school, was severely depressed and sometimes violent, and was recurrently being admitted to psychiatric hospitals. *Id.* at 767–69. Even when the child's mother posed direct questions about special education opportunities in the public school, the district did not inform her of her IDEA rights. *Id.* at 773.

The present case is quite different. Far from being apparent, Joseph's classification as ED and his need for special education was never obvious and remains extremely doubtful. Under these circum-stances, I have no reason to assume that Joseph's education at East Troy was not "appropriate." The practical effect of Hoffman's lack of information was merely to delay his action for reimbursement for a number of months. This is not a sufficiently serious harm to justify reimbursement relief based on defendants' procedural violation. *See Heather S.*, 125 F.3d at 1059.

## D. Failure to Complete M-team Evaluation

██ Finally, I disagree with the RO that the Board committed any procedural violation in failing to complete an M-team evaluation on Joseph. *See* RO Decision, 26 IDELR at 523. Regulations required the Board to send a copy of the child's "placement offer" to the parents within 90 days of receiving the referral. Wis.Admin.Code § PI 11.03(2)(g) (1990). The same regulations allowed the Board to request and receive an extension of this timeline by first asking the child's parents to agree to a specific extension; and then, if the parent did not agree, by asking the division for handicapped children and pupil services to grant the request. Wis.Admin.Code § PI 11.06(5)(a) (1990). The division could grant a specific extension beyond the 90–day period if the Board showed that it had acted in good faith and that there was good cause to grant an extension. *Id.*

The record establishes that the Board properly complied with this procedure and requested and was granted three extensions of the 90–day period, the latest until August 27, 1995. In each instance, the division found that the Board had been acting in good faith in seeking the extension and that there was good cause to grant it.

I also conclude that good cause warranted the extensions and the Board acted in good faith in seeking them. Dr. Wilde testified that the first thing evaluators do when they receive an EEN referral is review the student's records, both aca-

demic and medical. (Tr. 3/27/96 at 59.) The records make it possible to plan and focus the rest of evaluation, including any interviews with the student.

A [Wilde]: Well, you know, there is a bit of an art to [evaluating a student]. It's not just about handing the kid a piece of paper and saying fill that out. I mean, there is tons of behavioral data to pour out of a kid . . . . .

. . . .

[Having the records] tells you a little more about the types of presenting problems so that you can then plan what types of instruments you might choose, what types of questions you might want to ask, what kind of areas you want to probe.

(Tr. 3/27/96 at 59–60.)

The importance of reviewing available records at the outset of an evaluation seems self-evident to me, as well. The record is clear that the Board did not receive copies of Joseph's academic and medical records from DeSisto until July 1995.

Based on the facts set out in the factual background section of this opinion, I also conclude that the Board properly requested copies of Joseph's records and was sufficiently diligent in pressing the Hoffmans to facilitate their transfer to Wisconsin. This is especially true in the fall of 1994. The Board's efforts in this respect may have slagged somewhat in early 1995, when the parties became engaged in adversarial proceedings before the administrative hearing officer. By this stage, however, the Hoffmans were represented by an attorney and were equally disinclined to harangue DeSisto for release of the records. In light of all these circum-

stances, the Board's attempts to acquire the records were sufficient.

Finally, as Joseph withdrew from DeSisto on July 4, 1995 as an adult and displayed no intention of continuing his education, defendants' already tenuous duty to evaluate Joseph and formulate an individualized program for him terminated at that time. *See* Wis.Admin.Code § PI 11.04(2) (1990). It is simply unrealistic bordering on the surreal to expect the Board to track down and evaluate Joseph in order to preserve his parents' right to reimbursement in the unlikely event that (1) Joseph was found to be ED, and (2) an IEP he would never use was deemed inadequate. Procedural compliance must make sense.

## VII. CONCLUSION

The silence at the center of this case is the voice of Joseph. One reason I have resisted reaching an ultimate conclusion on Joseph's ED status is that the record is devoid of any testimony from Joseph as to what was going on with him during his five months at East Troy.[6] The unusual factual posture of this case—the fact that Joseph was never evaluated for exceptional educational needs and never found to be disabled—puts the court in the position of a one-man M-team acting several years after the fact and without input from the student. Several witnesses testified that in conducting an M-team evaluation it is essential to interview the student at length. (Tr. 3/26/96 at 62, 122.) I would assume this is particularly true when the student is an intelligent, thoughtful young adult such as Joseph Hoffman.

In any event, regardless of whether Joseph was emotionally disturbed, plaintiff's

---

6. Joseph did testify before the administrative hearing officer on August 1, 1996, during the second round of due process hearings on his parents' claims. By that stage, the hearing officer had already determined that Joseph was ED and required special education. Defendants moved to allow Joseph—who had been previously unavailable to testify—to speak to his own emotional condition and

educational needs during his time at East Troy. The motion was denied. (*See* Tr. 8/1/96 at 126–138.) The hearing officer remarked that he did not "think any testimony from [Joseph] regarding his state of mind or perception of things two years ago has any relevance." (Tr. 8/1/96 at 135.) I can think of few things more relevant to these proceedings.

claim for reimbursement fails because defendants committed no procedural violations resulting in a denial of appropriate educational benefits to Joseph. *See Heather S.*, 125 F.3d at 1059. Plaintiff is therefore entitled to no reimbursement from defendants for the cost of his son's education at DeSisto. As a result of this finding, it is unnecessary for me to reach the question of whether DeSisto was an appropriate placement under the IDEA.

Based on the foregoing, **IT IS HEREBY ORDERED** that defendants' motions for summary judgment are **GRANTED;** plaintiff's motion for summary judgment is **DENIED;** and this case is **DISMISSED.**