In the Matter of Amanda SUZAWITH, Donna Suzawith, and Bucky Suzawith, Petitioners,

v.

**GREEN BAY AREA SCHOOL DISTRICT, Respondent.**

No. 99–C–423.

United States District Court, E.D. Wisconsin.

Sept. 29, 2000.

Alf Langan, Law Office of Alf Langan, Green Bay, WI, for petitioners.

Michael Aldana, Luis I. Arroyo, Quarles & Brady, Milwaukee, WI, for respondent.

## DECISION AND ORDER RE: RESPONDENT'S MOTION FOR SUMMARY JUDGMENT

CALLAHAN, United States Magistrate Judge.

### PROCEDURAL BACKGROUND

This action was commenced on March 25, 1999, when the petitioners, Bucky and Donna Suzawith ("the Suzawiths") filed a "Petition for Review", pursuant to Wis. Stat. § 115.81(8), in the Brown County Circuit Court naming the Green Bay Area School District ("the District") as respondent. In their petition the Suzawiths assert that on or about August 27, 1998, they requested a due process hearing on behalf of their daughter, Amanda, wherein they sought reimbursement for costs and expenses they incurred in placing Amanda at a residential treatment and educational facility in Faribault, Minnesota, i.e., the Wilson Center. Essentially, they sought reimbursement for such expenses on the grounds that the District had failed to provide Amanda a free appropriate public education (FAPE) in a timely manner prior to the petitioners' unilateral placement of Amanda at the Wilson Center. After several prehearing conferences, a due process hearing was conducted on November 19, 1998, before Administrative Law Judge Jacquelynn B. Rothstein of the Wisconsin Division of Hearings and Appeals. On February 9, 1999, ALJ Rothstein issued her Final Decision and Order in which she denied the petitioners' claim for reimbursement.

After being served with a copy of the petition for review, the District removed the action to this court on the grounds that "[t]he complaint ... alleges that the Green Bay Area School District violated Wis. Stats. § 115.80 and the Individuals with Disabilities Education Act, 20 U.S.C. § 1401, et. seq. [That Act] confers this Court with jurisdiction to hear appeals from state educational agencies." (Notice of Removal, ¶ 5). Thereafter an answer was filed.

Now pending before the court is the respondent's motion for summary judgment in which it seeks a determination that the petitioners are not entitled to the reimbursement that they seek. The motion is fully briefed and is ready for resolution. This court has jurisdiction pursuant to the provisions of 20 U.S.C. § 1415(i). Venue is proper in this district pursuant to 28 U.S.C. § 1391. The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and Rule 73(b) of the Federal Rules of Civil Procedure. For the reasons which follow, the respondent's motion is granted.

### FACTUAL BACKGROUND

In accordance with Local Rule 6.05 (E.D.Wis.) the respondent filed proposed findings of fact along with its motion for summary judgment. Set forth in such submission were 103 proposed findings of fact.

In response to the respondent's proposed findings of fact, the plaintiffs filed, inter alia, a "response to respondent's proposed findings of fact." In that submission they respond to the respondent's proposed findings, but proceed, at times, to use their responses to the proposed findings as an opportunity to argue the merits of the motion. This is not the purpose of the submissions called for by Rule 6.05.

Be that as it may, the court has reviewed the respondent's proposed findings of fact and the plaintiffs' responses thereto and has concluded that the following are undisputed facts in this action. Other facts that the court views, based on the record, as being undisputed (although the plaintiffs' responses to the respondent's proposed findings may not indicate them to be so) will be discussed in the body of this decision and order.

Petitioners Bucky and Donna Suzawith are the parents of Amanda Suzawith. (Respondent's Proposed Findings of Fact # 1 (RPFF # 1)) Petitioners reside at 706

Roy Ave., City of Green Bay, Brown County, Wisconsin 54303. (RPFF # 2)

Amanda Suzawith was a student at the Franklin Elementary School enrolled between the Fall of 1995 and the Spring of 1998. (RPFF # 3) Since the September 23, 1997, Multidisciplinary Team Report, Amanda has been identified as a student in need of exceptional education services. (RPFF # 6) Amanda had previously received special education services in the District's early childhood program when she was 3–4 years old. (RPFF # 4)

Amanda's brother, Brandon, has also been identified as a student in need of exceptional educational services, and has been placed in the special education program in the District. (RPFF # 5)

During the 1996–97 school year Amanda received referrals for failing to bring gym clothes to school, for not serving after school detentions, for distracting behavior in the class, for talking sometimes instead of listening, for not always doing her work, for refusal to open book, and for refusal to start worksheets. (RPFF # 10)

Mrs. Karpinski would meet and discuss with Amanda her progress during the fall school year of 1996–97, as she did with all other students who received referrals. (RPFF # 11)

In October of 1996, Mrs. Karpinski met with Mrs. Suzawith in order to address some of the concerns Amanda's behavior was raising. Mrs. Suzawith explained the problems she was having with Amanda were at home. (RPFF # 12)

Based on the problems Mrs. Suzawith was having at home and in the community with Amanda, Mrs. Karpinski recommended that an evaluation be conducted for Amanda to determine her eligibility for special education services. (RPFF # 14)

Mrs. Karpinski made herself more available to Amanda; Mrs. Karpinski had the school refer Amanda to her if she was ever sent to in school suspension; Mrs. Karpinski referred Amanda to the youth outreach program run through the Family Service Association in which an outreach worker, Carrie Pasterski, worked on decision-making, anger management, making healthy choices, and also provided some out of school activities with students. (RPFF # 17)

Mrs. Karpinski continued to collaborate with the in-home team working with the Suzawiths and kept the school posted as to any progress or problems the Suzawiths were having at home so that Mrs. Karpinski would be able to provide continuity of service at school. (RPFF # 18)

Mrs. Karpinski also established a peer tutoring program to help Amanda with her academic concerns in an effort to improve her grades and set up a daily monitor sheet to track her behavior in school, providing communication for the Suzawiths as to the progress Amanda was making at school. (RPFF # 19)

Mrs. Suzawith stated that "these problems are far beyond school," and indicated that school was the only place Amanda was not experiencing any chaos. (RPFF # 23)

For approximately four weeks in 1996 Amanda attended a day treatment program. (RPFF # 25) While she was in the day treatment program in 1996, Amanda was placed in her grandparent's home. (RPFF # 26) Amanda maintained a good relationship with her grandparents. (RPFF # 27)

On Thursday, January 30, 1997, although Amanda was attending school, Mrs. Suzawith came to Mrs. Karpinski's office indicating that Amanda had run away for a number of days. (RPFF # 28)

On Monday, February 3, 1997 Mrs. Karpinski again recommended to Mrs. Suzawith that Amanda be referred to the ED program so that the school would be able to address her special needs. (RPFF # 29)

Although Mrs. Karpinski continued to offer specialized interventions for Amanda for the rest of the 1996–97 school year, Amanda displayed different mood swings, difficulty paying attention, over tired at

school from her problems of running away from home, and just general sadness. (RPFF # 31)

The Spring of 1997 was a turbulent year at home for Amanda. Instances of running away from home, at times leading to truancy at school, and alleged instances of sexual abuse in the home are documented in Green Bay police reports. (RPFF # 32)

At one point during the 1996–97 school year, problems at home had escalated to such a point that Mrs. Suzawith would sit on Amanda. (RPFF # 34)

On April 10, 1997, Mrs. Suzawith had Amanda admitted into the Brown County Mental Health Center ("BCMHC"). (RPFF # 35) Amanda was released from BCMHC on April 21, 1997 and returned to school. (RPFF # 38) BCMHC did not suggest that residential treatment was appropriate for Amanda. (RPFF # 39) Mrs. Suzawith did not want to pay for foster care as BCMHC had recommended. (RPFF # 37)

The District was not contacted by the Suzawiths over the summer of 1997. (RPFF # 41)

On August 21, 1997, Mrs. Suzawith indicated that Amanda had run away from home to Chicago and Oklahoma. (RPFF # 43) During the August 21st conversation, Mrs. Suzawith mentioned that she had been gathering information about various agencies and had talked about the Wilson Center, which was referred to her by her private therapist, Lucy Forsting. (RPFF # 44)

On August 25, 1997, the EEN referral was completed and Amanda's case was discussed at the consultation team meeting, whose members (school administrators, counselors, teachers) agreed to make Amanda's case a top priority. (RPFF # 45) On August 25, 1997, an Intent to Refer for EEN Service letter and Parent Permission form was given to and signed by Mrs. Suzawith. (RPFF # 46)

Associate Principal Gerald Novak was contacted by Mrs. Suzawith on or about August 28 or 29, 1997, to discuss Amanda's situation. (RPFF # 49) After consultation with principal Keith Cauwenbergh, Mr. Novak contacted Mrs. Suzawith shortly after their initial August 28th conversation and indicated that the District would not pay for an out-of-district placement. (RPFF # 51)

On September 4, 1997, the EEN referral was completed and submitted to the school psychologist George Weisbeck. The District then sent out an M–Team invitation dated September 9, 1997 for a September 16th meeting. (RPFF # 47) At Mrs. Suzawith's request the District rescheduled the September 16, 1997 meeting for September 23, by a letter dated September 15th. (RPFF # 48, 54)

Despite Mrs. Suzawith's unilateral placement of Amanda at the Wilson Center on or about September 8, 1997, Mrs. Suzawith insisted that the District proceed with the referral process so that everything would be arranged when Amanda returned to the District in March of 1998, anticipating that the insurance money funding Amanda's stay at Wilson would run out. (RPFF # 53)

At the September 23 meeting, Mrs. Suzawith agreed that the M-team should proceed with the referral process even though Amanda was not present. (RPFF # 55) At the September 23 meeting, the M–Team relied on evidence of past performance and test records in basing its opinion on admitting Amanda into the ED program. (RPFF # 56) At the September 23 meeting, the M–Team, including Mrs. Suzawith, agreed that it would wait until Amanda returned from the Wilson Center before creating a placement for Amanda. (RPFF # 57) At the September 23 meeting, Mrs. Suzawith signed an extension of time for the development of the IEP. (RPFF # 58)

On September 4, 1997, during the referral procedure, Mrs. Suzawith asked Mrs. Karpinski to write a letter describing Amanda's performance at school. (RPFF # 59) Mrs. Karpinski's intent in drafting

the September 4th letter was to indicate that the resources in the regular education setting at Franklin, but not the special education setting, had been exhausted. (RPFF # 64)

The Wilson Center, a residential psychiatric facility, is one of the most restrictive environments. (RPFF # 67)

Upon Mr. Cauwenbergh's being advised of the situation [i.e., the District's receiving bills from the Wilson Center], he indicated that Mrs. Karpinski was to forward the bills to him who, in turn, forwarded the bills to the District's business manager Assistant Superintendent Dan Van De Water. (RPFF # 72) In November of 1997, and again in December, Mr. Van De Water sent a letter to the principal of Wilson indicating that it did not place Amanda at the Wilson Center and, thus, would not be paying the bills. (RPFF # 73)

During Amanda's stay at the Wilson Center from September of 1997 to March of 1998, Mrs. Suzawith and the Wilson Center would keep the District up to date on Amanda's status through conversations and diagnostic materials. (RPFF # 74)

On March 27, 1998, an IEP meeting was held to develop an appropriate IEP for Amanda upon her return from Wilson in April.(RPFF # 75) Mrs. Suzawith did not object to the IEP developed on March 27, 1998. (RPFF # 76) During the remainder of the 1997–98 school year, Mrs. Suzawith never raised any concerns about placement or programming at Franklin. (RPFF # 78)

A particular incident of misbehavior which occurred on May 29, 1998 centers around a series of incidents culminating in Assistant Principal Jerry Novak's request of Amanda to leave the school premises. (RPFF # 79)

On May 29, 1998, after a conference between Mrs. Suzawith, Amanda, and the District, Amanda refused to participate in a behavioral intervention, prompting an argument between Amanda and Mrs. Suzawith. (RPFF # 80) The intervention process is a part of the Dubuque Management Program used with ED students which provides students with the opportunity to take responsibility for their actions by talking about the problems they have caused, discussing appropriate behaviors, and apologizing to the offended person(s). (RPFF # 81)

Amanda later agreed to participate in the intervention on May 29th. (RPFF # 82)

Later on May 29th, Amanda was sent to the office for purposefully taking off her shirt on which paint had spilled, leaving herself improperly attired underneath. (RPFF # 83) While Mr. Novak had Amanda wait in the office until the referral could be written by the teacher, Amanda decided to leave the building unbeknownst to Mr. Novak. (RPFF # 84) Later that afternoon, when Amanda returned to school to participate in a party, Mr. Novak confronted Amanda according to school policy, which requires that if a child leaves the campus, they need to be accompanied by their parent upon their return. (RPFF # 85) Upon being confronted, Amanda became verbally aggressive. (RPFF # 86) After asking her to leave several times, Mr. Novak told Amanda that if she did not leave, she would be escorted away by the police. (RPFF # 87) After Amanda finally decided to leave school, Mr. Novak tried to contact Mrs. Suzawith that afternoon at the cell phone number Mrs. Suzawith said she could always be reached at, but he was unsuccessful. (RPFF # 88)

On June 6, 1998, after the end of the 1997–1998 school year, Mrs. Suzawith again sent Amanda to the Wilson Center. (RPFF # 90)

Amanda's March, 1998 IEP did not call for an extended school year placement. (RPFF # 92)

On August 27, 1998 the Suzawiths filed a due process hearing request. (RPFF # 96) Petitioners' due process request from attorney Alf Langan dated August 27, 1998, requested a review on the pri-

724

mary issues of "coverage of Amanda's previous stays at Wilson." (RPFF # 97)

On September 29, 1998 Administrative Law Judge (ALJ) Jacquelyn Rothstein issued a prehearing Memorandum and Order pursuant to a telephone conference with the Petitioners' attorney, Alf Langan, and the District's attorney, Michael Aldana. (RPFF # 98)

Judge Rothstein's preliminary order specifically provided that the only issues in question were:

(1) Are the Suzawiths entitled to reimbursement for Amanda's placement at the Wilson Center from approximately September 9, 1997 through March of 1998?; and

(2) Are the Suzawiths entitled to reimbursement for Amanda's placement at the Wilson Center from May 29, 1998 through mid-July, 1998? (RPFF # 99)

The only issue before the ALJ was whether the District is required to pay for the Petitioners' unilateral placement as a result of its alleged failure to provide Amanda FAPE in the 1997–1998 school year. (RPFF # 100)

## ANALYSIS

### Standard of Review

■ This court considers the issues before it under a different standard of review from that governing typical summary judgment motions. Section 1415 of the IDEA allows parties aggrieved by the findings and decision made by a state or local educational agency with respect to "any matter relating to the identification, evaluation, or educational placement for the child, or the provision of a free appropriate public education to such child" to bring a civil action in federal district court, appealing those findings and decision. 20 U.S.C. § 1415(b)(6), (f) and (i)(2). The

IDEA requires a district court reviewing a state administrative decision: (1) to receive the records of the administrative proceedings, (2) to hear additional evidence at the request of any party and, (3) "basing its decision on the preponderance of the evidence, [to] grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B). Here neither party has asked me, to hear additional evidence.[1] The respondent's motion for summary judgment is thus simply a procedural vehicle requiring me to decide this action on the basis of the administrative record. *Heather S. by Kathy S. v. State of Wisconsin*, 125 F.3d 1045, 1052 (7th Cir.1997). Despite being termed a "summary judgment", a district court's decision under § 1415(i)(2) should be based on a preponderance of the evidence standard. *Id.* Further, the party challenging the outcome of the state administrative decision bears the burden of proof. *Id.*; *Board of Education of Community Consol. Sch. Dist. 21 v. Illinois State Bd. of Educ.*, 938 F.2d 712, 716 (7th Cir.1991).

■ Section 1415(i)(2), however, is not a invitation for courts "to substitute their own notions of sound educational policy for those of the school authorities which they review." *Board of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). As a general matter, courts should be careful to avoid imposing their view of proper educational methods upon states. *Id.* at 207, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690. Accordingly, district courts must give "due weight" to the results of the state administrative proceedings, recognizing that courts lack special expertise in the area of educational policy. *Id.* Board of Educ. of Murphysboro Community Unit Sch. Dist. No. 186 v. Illinois State Bd. of Educ., 41 F.3d 1162, 1166 (7th Cir.1994); see also Butler v. Evans, 225 F.3d 887, 2000 WL 1231053, *4 (7th Cir.,

1. The parties have, however, presented to me a report prepared by Richard L. Stiver, Ph.D. and select portions of his deposition, both of which were generated after the issuance of the ALJ's decision.

August 31, 2000) ("The district court must confer due weight to the final decisions of the state administrators and cannot substitute its own notions of sound educational policy for those of the school authorities.") This deference in matters of educational methodology does not apply to the testimony of witnesses or to evidence in the record—both of which the court must independently evaluate—but to the conclusions of the administrative hearing officers. *Heather S.*, 125 F.3d at 1053.

■ Finally, the IDEA grants district courts broad discretion to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B)(iii). The Supreme Court has affirmed the lower courts' conclusion that this language implies "that equitable considerations are relevant in fashioning relief" under the statute. *School Comm. of the Town of Burlington, Mass. v. Dep't of Educ.*, 471 U.S. 359, 374, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985).

## Reimbursement under the IDEA

■ In *Hoffman v. East Troy Community School District*, 38 F.Supp.2d 750 (E.D.Wis.1999), a case (like the one at bar) involving a claim for reimbursement under the IDEA, United States District Judge Lynn Adelman noted that the Supreme Court had implied a right of reimbursement under the IDEA in 1985 in Burlington, and that the statute was thereafter amended to reflect that right. See 20 U.S.C. § 1412(a)(10)(C). "Burlington held that under the logic of the IDEA a court's authority to grant 'appropriate' relief must include 'the power to order school authorities to reimburse parents for their expenditures on private special education for a child,' if the court ultimately determines that the private placement, rather than the proposed IEP, is proper under the Act." *Burlington*, 471 U.S. at 369, 105 S.Ct. 1996, 85 L.Ed.2d 385. The law is clear that reimbursement is appropriate only if a federal court concludes both that (1) the public placement violated the IDEA and (2) the private school placement was proper under the Act. *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993)." *Hoffman*, 38 F.Supp.2d at 760–61. Finally, "[p]arents not only must show that placement in a private school is 'proper under the Act' but also must persuade a district court to exercise its discretion to provide reimbursement. The Court [in Burlington] emphasized that discretion, which means that reimbursement is not a matter of entitlement. 'The statute directs the court to "grant such relief as [it] determines is appropriate" [when the school district's plan is inadequate]. The ordinary meaning of these words confers broad discretion on the court.'" *Linda W. v. Indiana Department of Education*, 200 F.3d 504, 506 (7th Cir.1999).

■ Just as in Hoffman (and similar cases), where there had been no public placement in the first instance "because a child was never properly evaluated, or was found not to be disabled, or because an IEP was never developed as called for under the Act", Id. at 761, so too in the instant case, "the first condition for reimbursement may still be satisfied if the public school district has 'defaulted on its obligations under the Act' in some other respect." Id. It is not all procedural violations under the Act, however, that establish a denial of free appropriate public education such that reimbursement is warranted; rather, it is only those violations that are sufficiently harmful and serious that do so. "[T]he procedural violation must result in a denial of appropriate educational benefit to the child in question in a manner similar to, or on par with a lack of full parental involvement at the IEP formulation stage." Id. at 761.

## The Decision of the ALJ

As stated previously, a hearing was conducted before an Administrative Law Judge with respect to the claim that the plaintiffs were entitled to reimbursement for costs they incurred in connection with

their unilateral placement of Amanda at the Wilson Center, a residential treatment facility located in Minnesota from September 1997, through March of 1998, and from May 29, 1998, through mid-July, 1998. The hearing was held on November 19, 1998. Both sides were represented by legal counsel. Testifying at the hearing were Debra Karpinski, Carrie Pasterski, Ann Recka, Gerald Novak, Lucy Forsting, William R. Warren, David Zadnik, Lynne Maslowski and Donna Suzawith. After allowing the parties an opportunity to brief the issues, the ALJ issued her decision on February 9, 1999, in which she found against the petitioners.

In her decision the ALJ found as follows:

Amanda was enrolled as a student in the Green Bay Area Public School District at the outset of the 1997–98 school year. On or about August 21, 1997, Donna Suzawith requested that an exceptional education ("ED") referral be initiated for Amanda. On August 25, 1997, the District forwarded an "Intent to Refer" and a "Consent for Evaluation" form to Donna Suzawith. Donna signed the forms and returned them to the District.

On August 27, 1997, Amanda was admitted to the Bellin Psychiatric Center. On September 9, 1997, she was released to the custody of her parents, and was transferred to the Wilson Center in Faribault, Minnesota, where she remained until she was discharged on March 30, 1998. On September 4, 1997, Debra Karpinski, a counselor at Franklin Middle School, wrote a letter supporting the Suzawiths' decision to seek residential treatment for Amanda. That letter, however, was not an offer of placement of Amanda into such facility by the District.

A multidisciplinary team meeting ("M–Team") was scheduled to be conducted on September 16, 1997. Donna Suzawith was not able to attend that meeting. Thus, it was rescheduled for September 23, 1997. The M–Team did meet on September 23, 1997, and concluded that Amanda was a child with a disability and should therefore receive special education services to address her emotional disturbance ("ED"). During that same meeting Donna Suzawith informed the District staff that Amanda would likely remain at the Wilson Center for approximately six months.

Because Amanda was hospitalized at the Wilson Center and was not expected to return to the District until the Spring of 1998, the development of her IEP was delayed, at Donna Suzawith's request, until shortly before Amanda was to return to the District. Donna Suzawith signed a "Parental Approval For Extension of Timeline", which extended to April 30, 1998, the time in which to complete Amanda's evaluation.

On or about March 19, 1998, an invitation to an Individualized Education Program ("IEP") meeting was sent to the Suzawiths. An IEP meeting was held on March 27, 1998. At that time an appropriate IEP was developed for Amanda. The Suzawiths agreed to place Amanda at Franklin Middle School where she began receiving services in a program for ED students.

On May 28, 1998, Amanda had a "verbal altercation" with the associate principal at Franklin Middle School. She was thereafter, i.e., on June 6, 1998, readmitted to the Wilson Center. She remained there for approximately six weeks. She was released in mid-July, 1998.

The ALJ found that the District did not fail in its obligations to the Suzawiths under the Individuals With Disabilities Education Act ("IDEA"). Specifically, the ALJ found that the letter which had been written by Debra Karpinski in September, 1997, did not constitute an agreement by the District to place Amanda at the Wilson Center. This was so for several reasons. First, at the time Debra Karpinski wrote the letter, the District had not yet completed its evaluation of Amanda; it had not

yet determined whether she was eligible for special education under the IDEA. Moreover, Debra Karpinski did not, in any event, have the authority to authorize Amanda's placement anywhere, let alone at the Wilson Center. To the contrary, placement determinations are to be made by the entire M-team, not just one individual. See 20 U.S.C. § 1414; § 115.80, Wis. Stats. Finally, the letter was not for the purpose of determining Amanda's special education status. Instead, it was written at Donna Suzawith's request for the purpose of assisting the Suzawiths in obtaining insurance coverage for Amanda's stay at the Wilson Center.

The ALJ further found that, even if there had not been an agreed-to delay of the development of Amanda's IEP, there was no evidence that the M-Team would, in any event, have thought that it was educationally necessary to place Amanda at the Wilson Center. This is because, under the IDEA, the District would have been obligated to offer Amanda an education in the least restrictive environment. See 20 U.S.C. § 1412(a)(5). The Wilson Center, being a private residential psychiatric facility, was one of the most restrictive settings in which to place a child. Thus, it would not have been the first option to have been considered by the District.

The ALJ also found that the District did not violate its obligations under the IDEA by failing to provide Amanda a free appropriate public education ("FAPE"), thereby forcing her parents to enroll her at the Wilson Center. To the contrary, at the time the Suzawiths placed Amanda at the Wilson Center, i.e., September 9, 1997, the District was in the midst of conducting its evaluation of her. As stated previously, on or about August 21, 1997, Donna Suzawith requested that an exceptional education ("ED") referral be initiated for Amanda.

On August 25, 1997, the District forwarded an "Intent to Refer" and a "Consent for Evaluation" form to Donna Suzawith. Donna signed the forms and returned them to the District. A multidisciplinary team meeting ("M–Team") was scheduled to be conducted on September 16, 1997. But, because Donna Suzawith was not able to attend that meeting, it was rescheduled for September 23, 1997. The M–Team did meet on September 23, 1997, and concluded that Amanda was a child with a disability and should therefore receive special education services to address her emotional disturbance ("ED"). Under normal circumstances, the District would have been obligated to develop an IEP and placement offer within 30 days.[2] But, because Amanda had been unilaterally placed in the Wilson Center by her parents and because Donna Suzawith had agreed to delay the development of Amanda's IEP and placement until she returned from the Wilson Center, the statutory time line did not apply.

Furthermore, according to the ALJ, there was insufficient evidence to support a finding that an out-of-state residential treatment facility was, in any event, necessary for Amanda. In the view of the ALJ, "[a]lthough Amanda's behavior outside of school was decidedly problematic, she was not exhibiting extreme behaviors in school. To be sure, her in-school behaviors were not considered severe and would not have resulted in her being educated outside of the district." (Final Decision & Order, p. 5). (In this latter regard, the ALJ refused to consider the events of the 1996–97 school year and whether the District had failed to meet Amanda's needs during that period of time "[b]ecause the 1996–97 school was not at issue in [the hearing]". (Final Decision & Order, p. 4)).

The ALJ also found that the petitioners were not entitled to reimbursement of the

2. State law requires that an evaluation be conducted within 90 days of a referral (§ 115.78(3), Wis.Stats.) The District completed its evaluation within 30 days of Amanda's referral. An IEP must be developed within 30 days of a finding of eligibility for special education. 34 C.F.R. § 300.343.

costs they incurred in placing Amanda back in the Wilson Center from June 6, 1998, through mid-July, 1998. This is because, prior to that point in time, the District had developed and implemented an IEP for Amanda. And, in the view of the ALJ, the single incident (the "verbal altercation") with Assistant Principal Novak during which Amanda left school without permission, was insufficient to demonstrate that the IEP which had been developed for her was so insufficient that she had been deprived her right to a free and appropriate public education. Moreover, in the view of the ALJ, "one relatively minor incident [was not shown to have] justified an out-of-state placement at a residential facility." (Final Decision & Order, p. 5). Nor, had the petitioners shown that an extended school year placement was justified. "[A]n extended school year (ESY) placement is warranted only if an interruption in a child's education would lead to 'significant regression in the child's development level and the regression would be compounded by a limited capacity to recoup lost skills' ... In this case, there was no evidence that Amanda was likely to regress academically and be unable to recoup those skills during the following school year." (Final Decision & Order, p. 5).

In concluding that the petitioners were not entitled to reimbursement, the ALJ stated: "The Green Bay Area School District has demonstrated that it took the necessary steps to evaluate Amanda Suzawith and to determine whether she was a child in need of exceptional education. Before the District could complete its evaluation, including an offer of placement, the Suzawiths unilaterally placed their daughter in an out-of-state residential facility. In so doing, they effectively prevented the District from providing her with a free and appropriate public education. Accordingly, they are not entitled to reimbursement. They are likewise not entitled to reimbursement for Amanda's stay at the Wilson Center during the Summer of 1998,

because there was no demonstrated need for it." (Final Decision & Order, p. 5).

## The Dual Standard of Review Applicable in This Action

■ As stated previously, reimbursement is appropriate only if a federal court concludes both that (1) the public placement violated the IDEA and (2) the private school placement was proper under the Act. *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993)." *Hoffman*, 38 F.Supp.2d at 760–61. Moreover, where there had been no public placement in the first instance "because a child was never properly evaluated, or was found not to be disabled, or because an IEP was never developed as called for under the Act", *Id.* at 761, "the first condition for reimbursement may still be satisfied if the public school district has 'defaulted on its obligations under the Act' in some other respect." *Id.*

In the case at bar, the petitioners' claim for reimbursement really covers two separate placements and two separate periods of time. The first placement for which they seek reimbursement is Amanda's placement at the Wilson Center from September 1997, through March of 1998. The second placement for which they seek reimbursement is Amanda's placement at the Wilson Center from May 29, 1998, through mid-July, 1998.

Given the foregoing, if the petitioners are to be granted reimbursement for the first placement, they must demonstrate both that (1) the District defaulted on its obligations under the Act in some fashion other than that Amanda's public placement violated the IDEA (this is because as of the time Amanda was placed at the Wilson Center, there was no public placement; recall that it was not until March 27, 1998, that the District developed an IEP for Amanda) and (2) the private school placement was proper under the Act. If the petitioners are to be granted reimbursement for the second placement, they must

demonstrate both that (1) the public placement violated the IDEA (recall that, by the time that the second placement occurred, the District had developed an IEP) and (2) the private school placement was proper under the Act. Thus, in both instances, the petitioners must demonstrate that the placements of Amanda at the Wilson Center were proper under the Act.

### Was Placement at the Wilson Center Proper Under the Act?

■ In my view, the petitioners have not demonstrated by a preponderance of the evidence (as they must in order to be entitled to relief in this court, see *Heather S. by Kathy S.*, 125 F.3d at 1052) that either placement of Amanda at the Wilson Center was proper under the Act. This is because, simply stated, the preponderance of the evidence does not show that the Wilson Center was an appropriate placement for Amanda under the IDEA.

First of all, the IDEA does set forth a "preference" for mainstreaming. Title 20 U.S.C. § 1412(a)(5)(A) provides that:

A state is eligible for assistance under this part [20 U.S.C.S. §§ 1411 et seq.] for a fiscal year if the State demonstrates to the satisfaction of the Secretary that the State has in effect policies and procedures to ensure that it meets each of the following conditions: To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

Indeed, courts have referred to the "preference" for mainstreaming as a "requirement" under the IDEA, to the extent that mainstreaming is possible. *See Heather S.*, 125 F.3d at 1056–57; *Cleve-land Heights–University Heights City School District v. Boss by & Through Boss*, 144 F.3d 391, 399 (6th Cir.1998); *Kevin G. by Jo–Ann G. v. Cranston School Committee*, 965 F.Supp. 261, 264 (D.R.I. 1997) ("Plaintiffs point to the Act's requirement that students with special needs be placed in the 'least restrictive environment' possible, and 'mainstreamed', educated with other students without special needs in a regular classroom setting, whenever possible ... *See* 20 U.S.C.A. § 1412(5)(B); 34 C.F.R. § 300.552.")

Thus, in order for the petitioners to be entitled to reimbursement of the funds they expended in sending Amanda to the Wilson Center they must prove, by a preponderance of the evidence, that such placement was appropriate under the IDEA, including the Act's "least restrictive environment" requirement. In the view of the ALJ, this they did not do at the administrative stage. Specifically, in her decision the ALJ stated that "there is insufficient evidence to support a finding that an out-of-state residential treatment facility was necessary for Amanda. Although Amanda's behavior outside of school was decidedly problematic, she was not exhibiting extreme behaviors in school. To be sure, her in-school behaviors were not considered severe and would not have resulted in her being educated outside of the District." According the ALJ's decision "due weight" as I am required to do, I cannot say that such conclusion was wrong.

Indeed, the evidence offered by the petitioners at the administrative hearing concerning the appropriateness of placement at the Wilson Center was limited to the testimony of Lucy Forsting, a family therapist who was providing therapy to Donna Suzawith commencing in April, 1997. (Tr. p. 180) But, Ms. Forsting had no background in special education. (Tr. p. 191) And she had only met Amanda once. (Tr. p. 180) Moreover, she testified that the one time that she saw Amanda "Amanda was

brought in—I believe she was on the run at the time, and her mother wanted me to just talk to her about getting into some sort of therapy and would-you know-would I be a person that she could talk to because there wasn't a lot of individuals that she bonded well with, and at that time that I met with her, she wasn't going to bond with really anyone. She was desperately wanting to leave home, and I believe the comment she made to me was she was happier being on the run with friends, She didn't want any restrictions." (Tr. p. 192) In the end, Ms. Forsting testified that the reason she recommended that the Suzawiths place Amanda at the Wilson Center was: "It was just the fact that she [Donna Suzawith] was concerned for her well-being and safety that there was no other facility that we knew of where she could actually be kept in a locked-in unit until she was controllable." (Tr. p. 193) This was not the type of testimony which would have supported a finding that placement at a residential treatment facility such as the Wilson Center was the least restrictive educational environment for Amanda, especially in the face of the District's witnesses who all testified that residential treatment was not necessary and that the District could educate Amanda because she was a child with average ED problems.

In an effort to buttress their argument (and satisfy their burden of proof) that placement at the Wilson Center was appropriate, the petitioners have submitted to this court the report of Richard L. Stiver, Ph.D. In his report Dr. Stiver answers five questions. Those five questions are: (1) "Was Amanda Suzawith eligible for special education and related services at some point prior to the District's September 23, 1997 M–Team Findings of eligibility?", to which question he answered "Yes"; (2) "Would an earlier determination of eligibility and subsequent services have prevented the series of behaviors that prompted the Suzawiths to unilaterally place their child in residential treatment?", to which question he answered "Unknown: moot"; (3) "Was the M-team of September 23, 1997 timely enough to forestall the Suzawiths' unilateral placement?", to which he answered "No"; (4) "Was the IEP of March 27, 1998 and it's (sic) implementation appropriate to have forestalled the second unilateral placement?", to which he answered "No"; and (5) "Was the Suzawiths' unilateral placement of Amanda at the Wilson Center in the summer of 1998 an appropriate action?", to which he answered "Yes". After setting forth reasons for his answers, Dr. Stiver concludes his report by stating: "With nearly 35 years experience as a professional working in the area of special education for emotionally/behaviorally disordered children and youth, and with nearly 20 years experience as a first level due process hearing officer, it is my opinion that the petitioners should have prevailed in this case, on it's (sic) own merit, and certainly have just cause to appeal the initial findings."

To be sure, in his report Dr. Stiver states, in conclusory fashion, that "[t]he second placement at Wilson center was just as appropriate as the first unilateral placement." (Report, p. 6). Yet, noticeably absent from Dr. Stiver's report is any indication of familiarity with the Wilson Center. More specifically, nowhere in his report does Dr. Stiver offer any reasons as to *why* the Wilson Center was an appropriate educational placement for Amanda. Instead, the primary target of his report is the District in that his report is replete with criticism of the District in terms of its failure to prepare timely an IEP for Amanda. Indeed, at page 4 of his report he states: "In sum, throughout 1996–97 and in August–September 1997, the District had numerous opportunities to fulfill its' (sic) responsibilities. The District, unfortunately, chose not to; surrendering those responsibilities and the right to challenge the unilateral placement."

Subsequent to being provided a copy of Dr. Stiver's report, the District deposed him. A copy of the transcript of that deposition was filed with the court by the

District in its "Appendix To Respondent's Brief In Support Of Motion For Summary Judgment." In his deposition Dr. Stiver testified that he did not know whether the Wilson Center, as it existed in the Fall of 1997, in the Spring of 1998 or in the Summer of 1998, was the least restrictive environment in which Amanda could have been provided a free and appropriate public education ("FAPE") (Stiver Tr. pp. 35–36). He also testified that he did not know what Amanda's educational program was at the Wilson Center during the 1997/98 school year; nor was he aware of the educational program, if any, that was provided to Amanda at the Wilson Center during the Summer of 1998. (Stiver Tr. p. 40).

In sum, Dr. Stiver's report and deposition testimony go nowhere in demonstrating that the Wilson Center was, in fact, an appropriate placement for Amanda under the IDEA. Stated another way, Dr. Stiver's opinions about, inter alia, the District's failure to prepare an IEP in timely fashion and the District's failure to (on its own) initiate the process of determining if Amanda was eligible for special education based upon her conduct during the 1996–97 school year, do not show that the Wilson Center was the least restrictive environment in which Amanda could be educated. Without demonstrating by a preponderance of the evidence that placing Amanda at the Wilson Center was in conformance with the IDEA and with 34 C.F.R. § 300.550–554[3], the petitioners cannot show that such private "school" placement was proper under the Act. *Hoffman*, 38 F.Supp.2d at 760–61. And without showing that the private "school" placement was proper under the Act, the petitioners cannot demonstrate that they are entitled to have the court exercise its discretion and order reimbursement under the Act.

To be sure, the petitioners argue in their brief that "[p]etitioners had little choice but to place Amanda at Wilson Center. Amanda had been on the run for much of the summer, and had to be forcibly admitted to Bellin. She made it clear to her family that she intended to run again as soon as she was discharged. After Gerald Novak told Donna in August 1997 that the District would not pay for an out of district placement, she knew the family was on their own. Since Donna believed the District would not pay for Amanda's second placement due to Gerald Novak's statement to her the previous August, she had no reason to go to the District in advance of the second placement in June 1998. Donna faced the frightening probability in August 1997 and again in June 1998 that unless Amanda was placed in a secure facility she was going to run again, perhaps for good. Placing Amanda at Wilson Center was the only alternative that made sense to the Suzawiths given the circumstances they faced in August 1997 and again in June 1998. The Suzawiths were in danger of losing their 14–year–old daughter, and acted as they believed they had to." (Petitioners' Brief, p. 23)

This court does not question for one minute the petitioners' sincerity when they present that they were afraid of their daughter's running away and of their "losing" her. Nor is the court saying that the petitioners, as concerned parents, should not have admitted Amanda, or were somehow irresponsible in admitting Amanda, first to Bellin and then to the Wilson Center. What the court is saying, however, is that in order to obtain reimbursement from the District for the costs of admitting her to the Wilson Center, it is incumbent

3. 34 C.F.R. § 300.550 provides, in pertinent part, that "(b) [e]ach public agency shall ensure—(1) [t]hat to the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled; and (2) [t]hat special classes, separate schooling or other removal of children with disabilities from the regular educational environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily."

upon the petitioners to show by a preponderance of the evidence that the Wilson Center was the least restrictive environment possible for the education of Amanda during the period from September 9, 1997 until March 30, 1998, and then again from May 29, 1998, through mid-July, 1998. And, simply stated, they have not shown, by preponderance of the evidence, that to be so.

### Did the District Procedurally Default on its Obligations under the IDEA?

Even assuming, however, that the petitioners had demonstrated that placement at the Wilson Center was in conformity with the Act, i.e., that it was the least restrictive environment for Amanda's education, there are additional reasons why, in my view, the petitioners would nevertheless not be entitled to reimbursement.

The petitioners claim that they were forced to place Amanda in a private institution because the District did not comply with the Act in a timely fashion. Specifically, they argue that the "continuum of events from 1996 through August 1997" demonstrate that Amanda was in need of special education; that the District should have acted more promptly in identifying Amanda as a child in need of special education; that by the time it did undertake an evaluation of Amanda, it was too late. In other words, the District defaulted on its obligations under the Act.

This issue presents a bit of a problem for the court because the parties' respective arguments are like two ships passing in the night. On the one hand, the District argues that "the Petitioners confirmed several times throughout the hearing that the Suzawiths were not challenging the District's actions prior to the 1997–98 school year, and were focused only on the educational programming and related reimbursement issues for the 1997–98 school year ... Despite the clear stipulation by the Petitioners that the issues at the hearing were limited only to the 1997–98 school year as it related to placement at Wilson,

they now attempt to shift the focus of the issues ... Petitioners allege that the ALJ 'erred in her determinations of fact in that she did not acknowledge or consider any event that occurred prior to August 21, 1997; had she done so she would more likely have found that the District failed to provide FAPE due to the District's violation of § 115.80(1)(b), Wis.Stat. [1996–1997].' ... Essentially, Petitioners argue that the District failed to provide Amanda FAPE prior to the 1997–1998 school year by not having earlier identified her as a child with exceptional education needs. However, this claim was never raised prior to hearing. Moreover, Petitioners specifically waived any such claim during the hearing," (Respondent's Brief, pp. 10–11)

The petitioners, on the other hand, argue that there is a "fundamental misunderstanding between Petitioner and Respondent. Petitioner has adamantly and clearly stated from the beginning of the process, including the unsuccessful mediation sessions that occurred during the summer of 1998 (before Petitioner asked for a due process hearing), and in extensive detail in its Reply Brief following the due process hearing that the continuum of events leading up to the District's evaluation in September 1997 were the foundation of Petitioner's complaint against the District. Petitioner alleged violations of IDEA, and Wisconsin law and regulations from the beginning, based largely on the period leading up to the 1997–98 school year, specifically Amanda's seventh grade experience. Ignoring these events would be tantamount to attempting to figure out the plot of a mystery novel by reading only the last few pages. Petitioner complains that the District failed to provide FAPE during the 1997–98 school year, which is the result of the District's failure to identify and evaluate Amanda before then. That Respondent argues that the Court should also disregard these events is inappropriate and disingenuous. If the events of Amanda's seventh grade experience are irrelevant, why are most of Re-

spondent's first forty-one paragraphs of its Proposed Findings of fact Respondent's version of that experience? Similarly, why did Respondent's counsel call as its first witness at the due process hearing Debra Karpinski, who testified for almost 63 pages about Amanda's seventh grade year? ... Because Respondent knows as well as Petitioner that those events are extremely important in order to gain an understanding of the District's actions in September 1997 and May–June 1998. Respondent in effect wants it both ways: Respondent wants the Court to accept its perspective of Amanda's seventh grade year, and then disregard those facts and determine the FAPE issue in the vacuum of August 1997 and beyond." (Petitioner's Response, pp. 17–18)

Making matters even more vexing for the court is the fact that, in her decision, the ALJ stated: "The Suzawiths further argue that the District is liable for the costs of Amanda's placement at the Wilson Center because it failed to meet her needs during the 1996–97 school year. Because the 1996–97 school year was not at issue in this hearing, I decline to address it here." At the same time, however, there was a substantial amount of evidence introduced at the hearing regarding Amanda's seventh grade year, i.e., the 1996–97 school year. And because such evidence was introduced, I fail to see how I can ignore such evidence given the fact that the IDEA requires a district court reviewing a state administrative decision: (1) to receive the records of the administrative proceedings, (2) to hear additional evidence at the request of any party and, (3) "basing its decision on the preponderance of the evidence, [to] grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B).

To be sure, the Suzawiths may not have been challenging FAPE in the 1996–97 school year. But they were challenging FAPE in the 1997–98 school year and were challenging the actions (or inactions) of the District in connection therewith. Such be-

ing the case, regardless of what "stipulation" the parties may or may not have entered into at the administrative level, I believe it is my responsibility to decide this matter on the entire evidentiary record, regardless of why certain evidence was offered before the ALJ and regardless of how its relevance was argued before the ALJ.

■ Having said all that, the question which needs to be answered, as stated previously, is whether the preponderance of the evidence in the administrative proceedings demonstrates that the District procedurally defaulted on its obligations under the Act in some respect sufficiently harmful and serious that it was similar to, or on par with, a lack of full parental involvement at the IEP formulation stage, the result of which default was a denial of appropriate educational benefit to Amanda. *Hoffman*, 38 F.Supp.2d at 761.

The District argues that "[b]ased on the problems Amanda was experiencing at home and in the community, Mrs. Karpinski and the Franklin Middle School's consultation team recommended, on at least three occasions during that school year [1996–97], that evaluations be conducted for Amanda to determine her eligibility for special education services ... Mrs. Suzawith consistently rejected any referrals, stating 'these problems are far beyond school,' and indicated that school was the only place Amanda was not experiencing any chaos ... Mrs. Suzawith also informed Mrs. Karpinski that she was seeking long term inpatient care at Bellin Psychiatric Center in Green Bay, Wisconsin ... No referral was initiated or evaluations done during the 1996–97 school year because of Mrs. Suzawith's rejections." (Respondent's Brief, p. 3) Accordingly, the District maintains that it discharged its obligations under the IDEA during the 1996–97 school year.

In contrast, the petitioners argue that there was no "referral" made during the 1996–97 school year because a "referral" must be in writing and there was no writ-

ten referral. And because there never was a written referral, the District cannot now be heard to argue that it is, in essence, the petitioners' fault that Amanda did not get properly evaluated during the 1996–97 school year. To the contrary, according to the petitioners, if a proper written referral had been made by the District during the 1996–97 school year, the petitioners would not have been put in the position of having to act in "emergency" fashion in September, 1997. In other words, the District's delay in initiating the evaluation process for Amanda put the petitioners in a "crisis posture" in September, 1997. And because it was the District that created the "crisis", it should not now be allowed to escape the consequences of its actions, or more precisely its inactions, in not initiating a written referral.

Specifically, the petitioners argue that:

[C]ounsel and District personnel allege that Donna Suzawith refused the offered EEN services. The basic fallacy of this position is that the District and District's counsel misuse the term 'referral', as that term of art is actually defined in the Wisconsin Administrative Code. PI 11.02(18) provides an ' "Exceptional educational needs referral" or "EEN referral" means a written statement submitted to a board under PI 11.03(2)(a),' which provides the procedural regulations for Wisconsin Statute § 115.80. PI 11.03(2)(a) reads:

Any person who has reasonable cause to believe that a child is a child with EEN may submit an EEN referral to a school board. An EEN referral shall be in writing and it shall include their reasons why the person believes that the child is a child with EEN.

The reason this is significant is that if an actual referral is made by the District and then refused by the student's parents, the District can probably escape liability for any unilateral action by the parents. The EEN process, which is governed by specific regulatory rules, consists of referral, evaluation, Multidis-

ciplinary Team (M–Team) meeting, identification, Individualized Education Plan (IEP) meeting, construction of individualized education plan, and then placement offer by District to parents. No part of the process may be skipped over or violated without poisoning the entire process. By deliberately misusing the term 'referral' . . Respondent is attempting to create the impression that the District correctly followed proscribed EEN referral procedure, when in fact District failed to do so by its own testimony. EEN referrals must be in writing, otherwise they are not referrals triggering rights and responsibilities under the IDEA legislation and supporting regulations, they are mere recommendations. Therefore, when Debra Karpinski testified . . . that she made oral EEN referrals to Donna Suzawith, in fact there could be no such thing. The District must follow the specific referral process outlined in PI 11.03. If the District fails to do so, then there can be no refusal of services by the Petitioner. A parent cannot reject an offer for evaluation for possible EEN services unless the offer, or referral, is made in writing. The District did not make an actual referral until August 25, 1997."

(Petitioner's Response, pp. 3–4)

The petitioners then proceed to argue that "Donna was in extreme distress during this period, which limited her ability to understand exactly what Debra Karpinski meant when she recommended that Amanda be evaluated. Nonetheless, the onus is not on the parent in this situation, but on the District to provide the parent with appropriately complete information regarding the options available to a parent with a troubled child." (Petitioner's Response, p. 6)

Moreover, the petitioners argue that the District violated § 115.80(1)(b), Wis. Stats., which provides:

A person who is required to be certified or licensed under § 115.28(7), who is employed by the school district in which

a child attends public school and who has reasonable cause to believe a child has exceptional educational needs shall report such child and any other information required to the school board.

And in this regard, according to the petitioners, Debra Karpinski's testimony that the consultation team was concerned about Amanda's condition reaching the point that the team wondered why they "were not going ahead with" evaluating her for EEN services demonstrates that there was reasonable cause to believe that Amanda had exceptional educational needs. Such being the case, § 115.80(1)(b) required them to report her to the school board as being in need of such services. Because they did not, Amanda did not get the services in time to avoid the "crisis" of August, 1997. (See Petitioners' Response, p. 7)

In sum, the petitioners argue that the District's failure to strictly comply with the statutory procedures set out above constituted a procedural default sufficiently harmful and serious that it was similar to, or on par with, a lack of full parental involvement at the IEP formulation stage, the result of which default was a denial of appropriate educational benefit to Amanda. *Hoffman*, 38 F.Supp.2d at 761.

As Judge Adelman observed in Hoffman, "[n]umerous circuits have affirmed that all procedural violations do not establish a denial of free appropriate public education such that reimbursement is warranted, only those violations that are sufficiently harmful and serious. *See, e.g., Heather S.*, 125 F.3d at 1059; *Doe by and Through Doe v. Metropolitan Nashville Pub. Sch.*, 133 F.3d 384, 388 (6th Cir.1998)(finding that reimbursement may be appropriate for 'sufficiently serious procedural failures by the school district' in conducting child-find procedures); *Ash v. Lake Oswego Sch. Dist.*, 980 F.2d 585, 589 (9th Cir.1992) (agreeing that when a school district has 'egregiously violated the procedural requirements' of the IDEA, reimbursement may be called for); *Doe v. Ala-bama State Dep't of Educ.*, 915 F.2d 651, 662–63 (11th Cir.1990)(holding that proper analysis of procedural violations 'considers the harm flowing from the violation in assessing whether relief is appropriate')." *Hoffman*, 38 F.Supp.2d at 761.

Even assuming that, as petitioners suggest, District personnel technically violated the above referenced statutory sections in the manner set forth by the petitioners, I am not persuaded that such claimed "procedural defaults" were of such a harmful and serious nature that they were similar to, or on par with, a lack of full parental involvement at the IEP formulation stage, the result of which defaults was a denial of appropriate educational benefit to Amanda.

As noted previously, Mrs. Karpinski and the Franklin Middle School's consultation team recommended, on at least three occasions during the 1996–97 school year, that evaluations be conducted for Amanda to determine her eligibility for special education services. Specifically, Mrs. Karpinski testified that "in October of seventh grade [October, 1996] the idea of an ED referral was brought up. I discussed it informally with the mother [Donna Suzawith]. At that point she refused ED testing ... her comment was Amanda's problems are not school related. The problem is much bigger than school, and she was seeking some assistance [by way of inpatient or residential facility] to work on a number of family issues and other much more psychological issues. She said it was not the school's problem". (Tr. pp. 21, 24) According to Mrs. Karpinski, Mrs. Suzawith told her that "[s]he was very fearful of potential gang involvement. She was highly concerned about Amanda's runaway status. She was concerned with different people that she was with, that it was an unsafe environment depending on the home or place or city that she was in. [She] was seeking long-term inpatient at Bellin at the time and spoke with me informally at that point but was concerned insurance would not pay for it." (Tr. p. 23)

Thereafter, on November 4, 1996, Amanda's name was brought up during one of the consultation team meetings. At that time it was suggested that an ED referral be made with respect to Amanda "so we could continue to serve her more at school" (Tr. p. 27) After that meeting, Mrs. Karpinski spoke with Donna Suzawith and told her about the consultation team's agreement that Amanda should be referred for an ED evaluation. In reaction to Mrs. Karpinski's informing Donna Suzawith of the consultation team's view, Mrs. Suzawith told Mrs. Karpinski "I'm needing help for the family. Amanda is out of control, and I'm looking for long-term." According to Mrs. Karpinski, Donna Suzawith wanted Amanda to be "placed outside of the home because of the chaotic situation and the potential abuse because of what was going on in the home." As her reason for not agreeing to have an ED referral done at that time Donna Suzawith said that she appreciated Mrs. Karpinski's "offering that, She understood why the school would offer that, but she said, 'These problems are far beyond school,' and actually school was not where she was experiencing the chaos." (Tr. p. 28)

Finally, on February 3, 1997, Mrs. Karpinski again brought up Amanda at the consultation team meeting. At that time the consultation team's meeting "concern was why we were not going ahead with this. I indicated to the team that the mother would not give us permission. (Tr. p. 33) The transcript reveals that Mrs. Karpinski then testified as follows:

Q. Did you talk with Mrs. Suzawith again?

A. Yes, I did.

Q. And what did you say to her?

A. What I said to her is please let us do this referral, that this would be of benefit. She would be placed in a setting where she would get more intervention to help with the academics.

Once again, the problems that Mother was concerned with did not have anything to do with the school, the child's safety.

Mother again was seeking long-term, had been looking at Bellin Psychiatric again for a longer term stay and reiterated "I want her out of the home and placed."

Q. Did she agree to allow the district to do an evaluation?

A. No, she did not.

(Tr. p. 33–34)

During her testimony, Donna Suzawith did not deny that such recommendations had been made to her. Rather, she stated that she did not recall such recommendations having been made, noting that "you've got to remember that, you know, the times that I was at school and discussing Amanda with [Mrs. Karpinski], we were in crisis situations, and it was a lot to deal with." (Tr. p. 281) However, Donna Suzawith also testified that Amanda had received special education in the District when Amanda was younger. Thus, the petitioners had at least some familiarity with the availability of special education services in the District.

Given all of the foregoing, it hardly seems reasonable to have the District shoulder the entire responsibility for there not having been a "written" referral, evaluation, Multidisciplinary Team (M–Team) meeting, identification, Individualized Education Plan (IEP) meeting, construction of individualized education plan, and then a placement offer prior to the 1997–98 school year. Simply stated, the preponderance of the evidence shows that the Suzawiths already had familiarity with the fact that the District could provide special education services and District personnel did on a number of occasions recommend to Donna Suzawith that evaluations be conducted for Amanda to determine her eligibility for special education services. While Donna Suzawith may not have formally "rejected" those recommendations, she certainly elected to not follow them. To be sure, the Suzawiths may have been struggling

with just how to best address the situation presented by Amanda's behavior. And this may have interfered with their "hearing" what they were being told by District personnel. But this is not a situation where a child "fell between the cracks" because school district personnel were asleep at the switch. It is, instead, a situation where the demands of the moment during the 1996–97 school year may very well have stood in the way of the Suzawith's clearly seeing the full picture.

If there was a deprivation of FAPE during the 1997–98 school year, I cannot say that it was caused any more by the District's failure to act in the face of parental resistance than it was by the parents' decision to not follow the District's recommendations to have an evaluation conducted. This is because, if Amanda was deprived of FAPE during the 1997–98 school year, such deprivation was caused by an IEP's not being done in time to have it implemented by the start of the 1997–98 school year. And the reason an IEP was not done by that point in time is because her parents chose not to follow the District's recommendations, on three occasions, that an evaluation be done.

Courts recognize that the IDEA places great value and importance on parental involvement and participation in, and contribution to, the entire evaluation process. The very language of the test under which the seriousness of a procedural default is examined demonstrates this to be so. ("[T]he procedural violation must result in a denial of appropriate educational benefit to the child in question in a manner similar to, or on par with a lack of full parental involvement at the IEP formulation stage." *Hoffman*, 38 F.Supp.2d at 761.) Without the parents' willingness to be involved in the process, one wonders just how productive the process would be. That is to say, one wonders just how "appropriate" the IEP that is ultimately developed will end up being, if the parents are not intricately involved in the process of developing such IEP.

The point that I am trying to make is that, although, to some degree, we are engaging in speculation, I am not persuaded that it was the District's not moving forward in the face of parental disapproval of, or at a minimum resistance to, EEN evaluation that "deprived" Amanda of FAPE during the 1997–98 school year. If her IEP was not developed by the start of the 1997–98 school year, the reason it was not so developed cannot fairly be said to be the exclusive fault of the District. In other words, the District's failure to initiate a referral *in this case* was not such a serious and harmful procedural default as to have resulted in Amanda's being deprived of FAPE during the 1997–98 school year.

In sum, given that (1) the school officials were in regular communication with the Suzawiths concerning Amanda, (2) those same school officials had on several occasions recommended to Amanda's parents that evaluations be conducted for Amanda to determine her eligibility for special education, (3) Amanda's parents were familiar with the concept and availability of special education services, and (4) Amanda's parents elected to not follow the school officials' recommendations, I cannot find, especially given the importance that the IDEA places on parental involvement in the entire process, see e.g. 20 U.S.C. § 1415(b), that the failure of school officials to move forward and formally refer Amanda for special education services constituted a procedural default so harmful and serious that it was similar to, or on par with, a lack of full parental involvement at the IEP formulation stage, the result of which default was a denial of appropriate educational benefit to Amanda. *Hoffman*, 38 F.Supp.2d at 761.

### The Equities Do Not Call For Reimbursement

This then takes me to the final reason for finding that reimbursement is not appropriate in this case. As stated previously, "[p]arents not only must show that placement in a private school is 'proper under the Act' but also must persuade a

district court to exercise its discretion to provide reimbursement. The Court [in Burlington] emphasized that discretion, which means that reimbursement is not a matter of entitlement. 'The statute directs the court to "grant such relief as [it] determines is appropriate" [when the school district's plan is inadequate]. The ordinary meaning of these words confers broad discretion on the court.'" *Linda W.*, 200 F.3d at 506.

█ In light of the fact that, during the 1996–97 school year, District personnel had on several occasions recommended to the Suzawiths that Amanda be evaluated to determine her eligibility for special education and that such recommendations were (regardless of reason) not followed, I am led to conclude that awarding to the Suzawiths reimbursement for the costs they incurred in unilaterally sending her to the Wilson Center would not be appropriate. To reiterate, even granting that District personnel could have moved forward on the evaluation of Amanda's eligibility for special education services without first getting the approval of her parents, the fact that they were hesitant to do so in the face of Mrs. Suzawith's resistance was not an entirely unreasonable course of action for the District to follow. After all, Mrs. Karpinski had been regularly seeing Mrs. Suzawith throughout the 1996–97 school year. They appear to have had a good rapport; indeed, the testimony adduced at the hearing would suggest that Mrs. Suzawith felt quite comfortable appearing unannounced at Mrs. Karpinski's office to discuss Amanda's situation.

Perhaps it is goes too far to say that the District, in the person of Mrs. Karpinski, should be commended for its sensitivity to the concerns and opinions of Mrs. Suzawith. After all, a school district and its personnel should always be sensitive to the concerns and opinions of the parents whose children attend the schools in that district. But, such sensitivity should not then be turned against the District and used as a sword in arguing that the Dis-

trict should have respected the parents' concerns and opinions less (indeed, should have ignored them) and done instead what the District felt best. That, in my view, would neither be fair nor equitable. For that further reason, I am exercising my discretion to not award reimbursement to the petitioners for the costs of Amanda's placement at the Wilson Center from September, 1997 to March, 1998.

### The Placement From May 29, 1998 Through Mid–July, 1998

But what about Amanda's placement at the Wilson Center from May 29, 1998, through mid-July, 1998? Are the Suzawiths entitled to reimbursement for that placement? In my opinion, they are not.

First of all, as stated previously, the petitioners have not shown by a preponderance of the evidence that during that period of time placement at the Wilson Center was appropriate under the IDEA's "least restrictive environment" requirement. To the contrary, the Wilson Center was a most restrictive environment.

Secondly, and again as previously noted, reimbursement is appropriate only if a federal court is persuaded, by a preponderance of the evidence, that the public placement violated the IDEA. In this case, specifically on March 27, 1998, an IEP meeting was held to develop an appropriate IEP for Amanda which would be implemented upon her return from the Wilson Center. Notably, the Suzawiths did not object to the IEP which had been developed for Amanda. And it was, in fact implemented in April.

To be sure, the record reveals that between her return to the District in late March, 1998, and the incident of May 29, 1998, in which she had a confrontation with Assistant Principal Novak, Amanda received eight disciplinary referrals. These were on or about (the copies in the administrative record are almost illegible) March 31, April 7, April 28, April 30, May 12, May 13, May 17, and May 28, 1998. But, during this same time period Mrs.

Suzawith did not raise any concerns about the placing or programming that Amanda was receiving at Franklin School. Indeed, during the administrative hearing Mrs. Suzawith testified that she never asked the District to revise Amanda's IEP. To the contrary, in response to being asked whether she agreed with the IEP and the placement that was developed when Amanda came back from the Wilson Center, Mrs. Suzawith stated "That was not her problem when she came back." (Tr. p. 334) According to Mrs. Suzawith, when Amanda initially came back to school she did well "before she started having difficulties with an administrator." (Id.) And in this regard, Mrs. Suzawith testified that she requested of Mr. Cauwenbergh "that Mr. Novak no longer be the person that Amanda has contact with if she has problems because he had lied to me also, not just Amanda, and I did ask that she not have to deal with him any longer." (Id. pp. 334–35)

■■■■■ An IEP is appropriate if it is reasonably calculated to enable a student to receive educational benefits. *Hendrick Hudson Cent. School Dist. v. Rowley*, 458 U.S. 176, 189, 206–07, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). A disabled child's individual education plan must be tailored to the unique needs of that particular child. *Heather S.*, 125 F.3d at 1055. But, the measure and adequacy of an IEP is to be determined as of the time the IEP is offered to the student, not at some later date. *O'Toole v. Olathe Unified School Dist. No. 233*, 144 F.3d 692, 701–02 (10th Cir.1998); *see also Roland M. v. Concord School Comm.*, 910 F.2d 983, 992 (1st Cir. 1990)("An IEP is a snapshot, not a retrospective.")

During the course of the hearing before the ALJ, testimony was presented regarding the appropriateness of Amanda's IEP. Specifically, William R. Warren (a program support teacher in the Green Bay Area Public Schools who was not at the IEP meeting of March 27, 1998) and Lynne Maslowski (an employee of CESA

10, and the assistant director of special education for four school districts) both testified that, in their opinion, the IEP which had been developed for Amanda was appropriate. Indeed, and as pointed out by the respondent in its brief, they highlighted the fact that Amanda's behavioral problems were by no means extreme and that her condition was average when compared to the other students in ED programs. Their testimony was, for all intents and purposes, uncontradicted.

To be sure, Dr. Stiver's written report (which was not prepared until after the issuance of the ALJ's decision) finds fault with the IEP that was developed for Amanda in March, 1998. In particular, he opines that "district failed to develop an appropriate IEP consistent with Amanda's present level of performance at the time of initial discharge from the Wilson Center; District failed to determine at the IEP meeting whether an extended school year was appropriate; District failed to consider whether an extended school year was appropriate at any time after the IEP meeting; District failed to consider Amanda's history of difficulties during prior summers." (Stiver Report, p. 6) But, at his deposition Dr. Stiver testified as follows:

Q. So then it does boil down to the single incident that leads you to the conclusion that Amanda was denied FAPE in the spring of 1998?

A. It's not the singular thing. I would say it is the culmination of some things, a number of things were probably going on in her life.

Q. Okay. Can you tell me what they were?

A. No.

Q. So as far as what your base of knowledge is in arriving at your opinion that the '98 IEP did not provide FAPE to Amanda, it boils down to the altercation with the principal, isn't that correct?

A. Based on the testimony of people, yes.

Q. That's the only thing that you're aware of that happened in the spring of '98, correct?

A. Yes.

In sum, Dr. Stiver testified that it was the event of May 29, 1998, between Amanda and Mr. Novak that caused him to conclude that Amanda was not provided FAPE in 1998, i.e., that her March, 1998 IEP was inappropriate. Simply stated, Dr. Stiver's opinion is, in my view, not sufficiently well founded to show, by a preponderance of the evidence, that Amanda's IEP of March, 1998, was inappropriate and that therefore she was denied FAPE. Such being the case, because reimbursement is appropriate only if a federal court is persuaded, by a preponderance of the evidence, that the public placement violated the IDEA (and I am not so persuaded), I am compelled to find that the petitioners are not entitled to reimbursement for their placement of Amanda at the Wilson Center from May 29, 1998, through mid-July, 1998.

## CONCLUSION

In conclusion, the picture painted by the events in this case is indeed a very sad one. The Suzawiths no doubt were "tearing their hair out" over what to do about their teenage daughter's rebellious behavior during the 1996–97 and 1997–98 school years. I cannot necessarily fault them as parents for taking Amanda out of school and placing her in a "locked down" facility. But, that the Suzawiths' action in placing her at the Wilson Center may have guaranteed that Amanda would not be able to run away as long as she was confined there does not therefore mean that such placement was the least restrictive environment in which Amanda could have received the free and appropriate public education to which she was entitled under the IDEA. And, for the reasons set forth above, the Suzawiths have not shown, by a preponderance of the evidence, that to be so.

Nor have the Suzawiths shown that the District's failure to proceed with the EEN evaluation process in the face of the Suzawiths' not agreeing to the same constituted a procedural default so harmful and serious that it was similar to, or on par with, a lack of full parental involvement at the IEP formulation stage, the result of which default was a denial of appropriate educational benefit to Amanda.

Finally, for all of the reasons set forth above, I am persuaded that it would be inequitable to order the District to reimburse the Suzawiths for the costs that they incurred in unilaterally placing Amanda at the Wilson Center.

Thus, and for all of the foregoing reasons, the respondent's motion for summary judgment will be granted and this action will be dismissed.

**NOW THEREFORE IT IS ORDERED** that the respondent's motion for summary judgment be and hereby is **GRANTED;**

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED.**